JOHN A. and MARJORIE E. HARMON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harmon v. Commissioner
Docket No. 27143-84.
United States Tax Court
T.C. Memo 1986-305; 1986 Tax Ct. Memo LEXIS 302; 51 T.C.M. (CCH) 1491; T.C.M. (RIA) 86305; July 23, 1986. Jeffrey Dickstein (at trial only) and William Van Doren (post-trial only), for the petitioners. Michael R. McMahon, for the respondent. COHEN *304 MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $19,483 and $30,116 in petitioners' Federal income taxes for 1979 and 1982, respectively. By Amendment to the Answer, respondent alleged additional amounts to be due under sections 6659, 6653(a), 6621, and 6661. [1] At issue is petitioners' entitlement to deductions and investment tax credit in relation to lease of a children's record, lease of a video game, and a ceramics and quilting activity. FINDINGS OF FACT Petitioners were residents of Alaska at the time they filed their petition herein. They filed joint individual income tax returns for 1979 and 1982 with the Internal Revenue Service Center at Ogden, Utah. On December 30, 1982, petitioners entered into an equipment lease with Cambridge Systems Leasing Corporation (Cambridge) for the lease of a 45 rpm master children's recording entitled "Talking Books for Children: Tale of Benjamin Bunny" (Benjamin Bunny). Benjamin Bunny is the creation of Beatrix Potter, the well *305 known author of Peter Rabbit. The lease provided in part: 2. Term: The term of the lease shall commence on the date hereof and shall be for a period of ninety-six months (eight years), provided, however, that Lessor shall have the right to terminate the term of this lease by notice in writing to Lessee to such effect, given within thirty (30) days after the expiration of sixty-one (61) months of the term hereof, if Lessee has not within said sixty-one month period paid to lessor any additional rental pursuant to paragraph 3A hereof. 3. Rental: The prepaid rental shall be paid on execution hereof and allocated as follows: CIRCLE:
A
B
C
D
Advance Rental:
$5,000.00
$7,500.00
$10,000.00
$2,500.00
Allocation: 1st Year 65%
$3,250.00
$4,925.00
$6,500.00
$1,625.00
Years 2-8-5%
250.00
375.00
500.00
125.00
3A. Additional Rental: Lessee shall remit to Lessor as additional rental hereunder, twenty-five (25) percent of all "gross revenues" earned by the Master during the term hereof and received by any distributor of copies of the Master, prior to any deduction for cost of pressing, distribution, and promotion, or otherwise (i.e., such "gross *306 revenues" shall equal all sales receipts by a distributor (whether or not such distributor is the Lessee) at wholesale prices, of records produced from the Master). All such additional rental payments shall be made to Lessor within thirty (30) days after the distributor(s) employed by Lessee (or Lessee himself if Lessee is the distributor) receives and computes such "gross revenues". Lessee shall compute, or shall cause each distributor of copies reproduced from the Master hereunder to compute "gross revenues" received with respect to the Master not less frequently than on six (6) month intervals during each calendar year of the term hereof, and shall pay or cause each distributor to pay the additional rental due to Lessee [sic] as required hereunder. At Lessor's request, Lessee shall conduct such reasonable examination of any distributor's books and records as may be reasonably necessary to verify the accuracy of computations and payments made with respect to the Master by such distributor. Petitioners paid $5,000 to Cambridge on December 30, 1982, which, under the terms of the agreement with Cambridge, was allocated $3,250 rental attributable to the first year of the lease *307 and the balance of $1,750 attributable to years 2 through 8 of the lease at $250 per year. The lease agreement provided for additional rental of 25 percent of gross revenues earned by Benjamin Bunny. Also on December 30, 1982, petitioners entered into an employment agreement with Aim Record Distribution, Inc. (Aim Record) for distribution of Benjamin Bunny. The agreement provided in part: 3. Term. Distributor's employment commences as of the date hereof and shall continue thereafter for thirteen months, unless terminated at any time prior thereto by the Owner on sixty days prior written notice; provided, however, that in the event of such termination, Distributor shall have the right to sell off any inventory of Recordings on hand as of the date of receipt of such notice. 4. Delivery Requirements. At all times during the term, the Master Recording shall remain the property of the Owner. The Owner, however, shall make available to Distributor, on request, the Master Recording, photographs, biographical material relating to any artist and the individual producers, label data, parts, copyright information, and such other material, as may relate thereto. Distributor acknowledges *308 that all such items shall be delivered to the Distributor subject to the rights of Owner's lessor of the Master Recording. 5. Manufacture, Release, Distribution and Sale of the Recordings. a) Distributor accepts employment hereunder and shall, on behalf of the Owner and solely upon the prior written authorization of the Owner, cause Recordings to be manufactured from time to time so as to enable their contemplated commercial exploitation. Such manufacture, subject to such prior written authorization, shall be at the Owner's sole cost, expense and liability. Supplementing the foregoing, upon execution hereof the Owner will make an advance payment of $2,500 for 33-1/3 r.p.m. long-play recording or equivalent cassette; or $1,500 for 45 r.p.m. single, to Distributor, to cover all of the costs of manufacturing and distributing (other than Distributor's Fee as hereinafter provided) of the Initial Run of Recordings within the United States. Such manufacture shall begin and be completed as and when required by the demand for the Recordings. In the event the Recordings are 45 r.p.m. Recordings such manufacture shall not exceed 1,050 copies. In the event the Recordings are 33-1/3 long *309 play Recordings or equivalent cassette such manufacture shall not exceed 1,050 copies. Distributor shall not be required to account to the Owner for the application of such advance payment. b) Distributor shall cause the release of the Recordings in the United States not later than one hundred twenty days from the date of delivery of all the items included in Paragraph "4" hereof, provided that Owner shall have complied with the delivery requirements set forth in Paragraph "4" hereof and the Owner shall have made the payment called for in paragraph "5.a)" hereof. c) Subject to the foregoing, Distributor shall have the sole right to determine and control the manner of release, sale, distribution, sub-distribution and other exploitation with respect to the Recordings, such right to include, without limitation, the following rights: (i) to determine the wholesale and retail selling price of the Recordings; (ii) to distribute the Recordings on a free or no-charge basis to disc jockeys, distributors, dealers and others for promotional purposes or otherwise in connection with their sale, regardless of whether such free or no-charge records are meant for resale to the ultimate consumer *310 and to sell Recordings as cut-outs or for scrap at a salvage or close-out price; provided, however, that no such cut-out or scrap sales shall be effected during the first three months of the term without the Owner's prior written consent, unless the Owner shall have cancelled this Agreement, as herein provided for, in which case Distributor shall have all such rights effective as of the date of receipt of such cancellation; (iii) to discontinue the manufacture of the Recordings; (iv) to make, alter and cancel contracts involving the manufacture, advertising, promotion and sale of the Recordings and to make allowances and give credits to its sub-distributors or other contracting parties; (v) to adjust and settle all disputes with its sub-distributors or other contracting parties. * * * 7. Fee for Services. In addition to the advance payment paid pursuant to Paragraph "5," herein and otherwise in full consideration of the services to be performed hereunder, Distributor shall be entitled to retain fees for Recordings sold by it as follows: a) From Gross Receipts Distributor shall retain ten (10%) percent thereof as a distribution fee for services hereunder. b) From the *311 balance of Gross Receipts remaining, Distributor shall retain the costs of: (i) manufacturing and packaging of Recordings; (ii) AFM, AFTRA and copyright royalties assessed on the sale of the Recordings manufactured, sold and not returned; (iii) costs of promotion, sales and advertising of Recordings; (iv) costs of freight and shipment of Recordings; and (v) all artists and producers royalties and payments to any musician or performer on the Master Recording due on account of sales of Recordings as required. c) The balance of all Gross Receipts shall be paid to the Owner as hereinafter provided for in Paragraph "8." Petitioners paid $1,500 to Aim Record on December 29, 1982. Also on December 30, 1982, petitioners entered into an equipment lease with Century Concepts, Inc. (Century) for the lease of a master video game entitled "Pulsator." The lease provided in part: 2. Term. The term of the lease shall commence on the date hereof and shall be for a period of ninety-six months (eight years), provided, however, that Lessor shall have the right to terminate the term of this lease by notice in writing to Lessee to such effect, given within thirty (30) days after *312 the expiration of sixty-one (61) months of the term hereof, if Lessee has not within said sixty-one month period paid to lessor any additional rental pursuant to paragraph 3A hereof. 3. Rental. The prepaid rental shall be paid on execution hereof and allocated as follows: Advance Rental:
$15,000.00
Allocation: 1st Year 65%
$9,750.00
Years 2-8-5%
750.00
3A. Additional Rental: Lessee shall remit to Lessor as additional rental hereunder, twenty-five (25) percent of all "gross revenues" earned by the Master during the term hereof and received by any distributor of copies of the Master, prior to any deduction for cost of reproduction, distribution, and promotion or otherwise (i.e., such "gross revenues" shall equal all sales receipts by a distributor (whether or not such distributor is the Lessee) at wholesale prices, or cassettes produced from the Master). All such additional rental payments shall be made to Lessor within thirty (30) days after the distributor(s) employed by Lessee (or Lessee himself if Lessee is the distributor) receives and computes such "gross revenues". Lessee shall compute, or shall cause each distributor of copies reproduced from *313 the Master hereunder to compute "gross revenues" received with respect to the Master not less frequently than on six (6) months intervals during each calendar year of the term hereof, and shall pay or cause each distributor to pay the additional rental due to Lessee [sic] as required hereunder. At Lessor's request, Lessee shall conduct such reasonable examination of any distributor's books and records as may be reasonably necessary to verify the accuracy of computations and payments made with respect to the Master by such distributor. Petitioners paid $15,000 to Century on December 30, 1982, which was attributed $9,750 to the first year of the lease and $5,250 to years 2 through 8 of the lease at $750 per year. The lease also provided for an additional rental of 25 percent of all gross revenues earned by Pulsator. Also on December 30, 1982, petitioners entered into an employment agreement with Aim Software Distribution, Inc. (Aim Software) providing for distribution of Pulsator. The agreement provided in part: 3. Term. Distributor's employment commences as of the date hereof and shall continue thereafter for thirteen months, unless terminated at any time prior thereto *314 by the owner on sixty days prior written notice; provided, however, that, in the event of such termination, Distributor shall have the right to sell off any inventory of Programs on hand as of the date of receipt of such notice. 4. Delivery Requirements. At all times during the term, the Master Program shall remain the property of the Owner. The Owner, however, shall make available to Distributor, on request, the Master Program, photographs, biographical material relating to any programmer and/or the individual producers, label data, parts, copyright information, and such other material, as may relate thereto. Distributor acknowledges that all such items shall be delivered to the Distributor subject to the rights of Owner's lessor of the Master Program. 5. Manufacture, Release, Distribution and Sale of the Programs. a) Distributor accepts employment hereunder and shall, on behalf of the Owner and solely upon the prior written authorization of the Owner, cause the Program to be manufactured from time to time so as to enable its contemplated commercial exploitation. Such manufacture, subject to such prior written authorization, shall be at the Owner's sole cost, expense and *315 liability. Supplementing the foregoing, upon execution hereof the Owner will make an advance payment of Thirty-Eight Hundred ($3,800) Dollars to Distributor to cover all of the costs of manufacturing and distributing (other than Distributor's Fee as hereinafter provided) of the Initial Run of the Program within the United States. Such manufacture shall begin and be completed as and when required by the demand for the Program. Such manufacture shall not exceed five hundred and eleven (511) copies. Distributor shall not be required to account to Owner for the application of such advance payment. b) Distributor shall cause the release of the Program in the United States not later than one hundred twenty days from the date of delivery of all the items included in Paragraph "4" hereof, provided the Owner shall have complied with the delivery requirements set forth in Paragraph "4" hereof and the Owner shall have made the payment called for in Paragraph "5.a)" hereof. c) Subject to the foregoing, Distributor shall have the sole right to determine and control the manner of release, sale, distribution, sub-distribution and other exploitation with respect to the Program, such right *316 to include, without limitation, the following rights: (i) to determine the wholesale and retail selling price of the Program; (ii) to distribute the Program on a free or no-charge basis to distributors, dealers and others for promotional purposes or otherwise in connection with its sale regardless of whether such free or no-charge programs are meant for resale to the ultimate consumer, and to sell the Program as cut-outs or for scrap at a salvage or close-out price; provided, however, that no such cut-out or scrap sales shall be effected during the first three months of the term without the Owner's prior written consent, unless the Owner shall have cancelled this Agreement, as herein provided for, in which case Distributor shall have all such rights effective as of the date of such cancellation; (iii) to discontinue the manufacture of the Program; (iv) to make, alter and cancel contracts involving the manufacture, advertising, promotion and sale of the Program and to make allowances and give credits to its sub-distributors or other contracting parties; (v) to adjust and settle all disputes with its sub-distributors or other contracting parties. * * * 7. Fee for Services. *317 In addition to the advance payment paid pursuant to Paragraph "5," herein and otherwise in full consideration of the services to be performed hereunder, Distributor shall be entitled to retain fees for Programs sold by it as follows: a) From Gross Receipts Distributor shall retain ten (10%) percent thereof as a distribution fee for services hereunder. b) From the balance of Gross Receipts remaining, Distributor shall retain the costs of: (i) manufacturing and packaging of the Program; (ii) copyright royalties assessed on the sale of the Programs manufactured, sold and not returned; (iii) costs of promotion, sales and advertising of the Programs; (iv) costs of freight and shipment of the Programs; and (v) any and all programmer and producer royalties and/or payments on the Master Program due on account of sales of the Program as required. c) The balance of all Gross Receipts shall be paid to the Owner as hereinafter provided for in Paragraph "8." Petitioners paid $3,800 to Aim Software on December 29, 1982. During 1982, petitioners had items of gross income, other than from the activities here in issue, totaling $91,013. Petitioners consulted with Elmer Pratt *318 (Pratt) concerning preparation of their tax return for 1982. Pratt advised petitioners to invest in Cambridge and Century programs. Pratt personally invested in other programs promoted by Cambridge and Century, after meeting with various indiividuals involved with the Cambridge and Century investment programs. Neither petitioners nor Pratt had any experience with marketing or distributing children's records or video games. According to Pratt, he "wanted to be certain that the tax aspects were right." Each of the Cambridge and Century programs was marketed as a "tax advantaged equipment lease," and promotional brochures relating to them emphasized representations that: Equipment leasing allows individuals to garner large Investment Tax Credits. * * * I.T.C. is a dollar-for-dollar swap with tax liability. In smaller print, each brochure stated that: [Cambridge or Century] as purchaser and lessor of each Master, is fully "at risk" for the value of the Master and will sign a full-recourse promissory note to that effect with each purchase. The I.T.C. is an elective passthrough mutually agreed to by the lessor and lessee. It is definitely advisable for the lessee to *319 go into the business of exploiting the Master. However, the choice of distributor as well as the methods utilized to market the Master are solely at the discretion of the lessee. Cambridge represented that each master 45 rpm associated with a lease payment of $5,000 would have a "master value" of $125,000 and result in an investment tax credit of $12,500. Century represented that each video game master associated with a lease payment of $15,000 would have a "master value" of $375,000 and result in an investment tax credit of $37,500. Petitioners did not engage in any negotiation of the terms of either lease entered into by them. Petitioners did not hear or see either Benjamin Bunny or Pulsator until on or after April 27, 1983. They secured no appraisals of either Benjamin Bunny or Pulsator before investing in the programs. On or after March 14, 1983, petitioners received from Cambridge two appraisals of Benjamin Bunny. On or after May 12, 1983, petitioners received from Century two appraisals of Pulsator. None of the appraisals set forth a fair market value in terms of the price at which the property would change hands between a willing duyer and a willing seller, neither *320 being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. All of the appraisals were based solely on projections of a stream of income to be received in the future assuming sales at particular prices and volume levels provided by Cambridge or Century. The appraisers assumed sales of 588,000 to 690,000 copies of Benjamin Bunny and 92,500 units of Pulsator over periods of 14 and 6 years, respectively. (The leases were for 8 years.) At no time did petitioners receive any data supporting the alleged appraisals other than representations of the sellers of Benjamin Bunny and Pulsator. Petitioners made no attempt to market Benjamin Bunny or Pulsator other than through Aim Record and Aim Software, which had not agreed to manufacturer more than 1,050 copies of Benjamin Bunny or 511 copies of Pulsator, respectively. Until a dispute arose over their tax treatment of the investments on their 1982 tax returns, petitioners did not make any further inquiries of Cambridge, Century, Aim Record, or Aim Software and incurred no expenses relating to Benjamin Bunny or Pulsator beyond the payments made in December 1982. Petitioners received a statement from *321 Aim Record dated March 31, 1984, reporting that there were no gross receipts from the sales of Benjamin Bunny in 1982 and 1983. On December 11, 1984, Aim Record sent petitioners a "final accounting" reporting that gross receipts from the sale of Benjamin Bunny in 1984 were $1.65. On March 31, 1984, Aim Software reported that there were no gross receipts from the sales of Pulsator in 1982 or 1983. On October 12, 1984, Aim Software rendered a "final accounting" that gross receipts in 1984 were $110.40. During 1982, petitioner Marjorie E. Harmon made quilts and ceramic figures. Although this activity started out as a hobby, Mrs. Harmon sold some of her creations. She charged customers what she believed to be the approximate costs of manufacture of the items. She received $1,282 from sales of those items in 1982. During 1982, petitioners engaged in some preliminary investigation of the possibility of a gun business. They did not, however, commence a gun business in 1982. Petitioners' income tax return for 1982 was signed on January 26, 1983. On that return, petitioners claimed to have invested in "qualified investment property" in the amount of $500,405, of which $125,000 *322 was attributable to Benjamin Bunny and $375,000 was attributable to Pulsator. Petitioners claimed investment tax credit of $50,041, and applied $19,388 to their reported 1982 income tax liability. They claimed and received a refund of taxes withheld from Mr. Harmon's wages in 1982. Petitioners elected to carryback $19,483 of the reported investment tax credit from 1982 to 1979, and they claimed and received a refund of that amount. On a Schedule C attached to their 1982 income tax return, petitioners reported a business activity of "marketing-sales & service." They reported gross receipts of $1,282 and costs of goods sold of $960. They claimed advertising expenses of $5,300, consisting of $1,500 paid to Aim Record and $3,800 paid to Aim Software, and a deduction for rent of $13,000, consisting of $3,250 paid to Cambridge and $9,750 paid to Century. In addition, they claimed the following expenses: Car and truck expense
$402
Depreciation
1,636
Dues and publication
74
Insurance
198
Legal and professional
services
100
Repairs
112
Supples
287
Taxes
55
In a statutory notice of deficiency dated April 26, 1984, respondent disallowed the investment *323 tax credit and all of the expenses claimed by petitioners other than $24 for costs of goods sold; $48 car and truck expense; and $157 depreciation. Lessors' elections to pass investment credits to petitioners as lessees were executed by Cambridge on or about May 17, 1983 and by Century on or about May 16, 1983. Petitioners consented to the elections on or about May 10, 1983. The principal purpose of the investment plans or arrangements made by petitioners with Cambridge and Century was the avoidance or evasion of Federal income tax. There was a substantial understatement of income tax on petitioners' return for 1982 attributable to petitioners' investment plans or arrangements with Cambridge and Century. OPINION Procedural Matters
Prior to trial, petitioners' sought continuance of this case "until the case against Cambridge Corp., Aim Distributors, and Century Concepts has been decided." No case involving the tax liability of the promoting entities, however, was found to be pending in this Court. Issues involved in determining the tax liabilities of Century, Cambridge, or the distributors would not be identical to or even correlative to issues in this case. [2]
*324 Petitioners also objected to being required to proceed with this case while other taxpayers, perhaps represented by counsel, who invested in the Century and Cambridge programs had not proceeded to trial. Although consolidation, selection of "test" cases, or other grouping of cases may be invoked by the Court where efficient use of time and money may be accomplished, petitioners are not entitled to delay trial of their own case. Petitioners secured refunds in excess of $50,000 based on the investment tax credits claimed by them and supported by a representation that they were in a trade or business. They cannot now be allowed to postpone indefinitely the determination of their entitlement to those credits because they lack knowledge about their purported trade or business. [3]
The Nature of Petitioners' Activities
To qualify for the investment tax credit or for the losses claimed on Schedule C of *325 their 1982 return, petitioners must establish that their activities with respect to Benjamin Bunny, Pulsator, or ceramics and quilting either constituted trades or businesses or were undertaken and carried on for the production of income. See Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Essential to such a showing is a demonstration that petitioners had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioners' objective of making a profit must be bona fide. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without *326 published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). "The courts have used words such as 'basic,' 'dominant,' 'primary,' 'predominant,' and 'substantial' to describe the requisite profit motive." Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). See also Herrick v. Commissioner,85 T.C. 237, 254 (1985); Flowers v. Commissioner,80 T.C. at 931. "Profit" in this context means economic profit, independent of tax savings. Herrick v. Commissioner,supra;Surloff v. Commissioner,81 T.C. 210, 233 (1983). Whether petitioners *327 possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances.[4]Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986), and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioners' mere statement of their intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. Moreover, as discussed in greater detail below, the absence of a particular indicia of profit motive may be more significant to our determination than the superficial presence of another indicia. Respondent's determination is presumptively correct, and petitioners bear the burden of proving petitioners' profit objective. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
*328 Based on the facts set forth above, we conclude that petitioners did not engage in the lease of Benjamin Bunny or Pulsator with an actual and honest objective of making a profit but instead engaged in the transaction primarily, if not exclusively, to obtain tax deductions and credits and thereby reduce the tax they would otherwise have to pay on their income from other sources. Moreover, we have found that the principal purpose of these activities was the avoidance or evasion of Federal income tax. Petitioners are therefore not entitled to the claimed deductions or investment tax credit. Petitioners contend that in 1982 they were seeking investments that would produce income for their retirement. They assert that they invested in Benjamin Bunny and Pulsator in reliance on Pratt and on the materials received from Cambridge and Century. It is apparent, however, that Pratt, Cambridge, and Century were recommending the investments based on the anticipated tax benefits, which, in summary, would supposedly secure for petitioners over $50,000 in immediate tax refunds in exchange for payments totaling $25,300. Petitioners had no obligation beyond the initial payment in the absence *329 of actual sales of the product, and they had no obligation to and in fact did not attempt to effect sales of the product. The purported fair market values of the items were based on assumed sales of at least 588,000 copies of Benjamin Bunny and 92,500 units of Pulsator, but petitioners never arranged for manufacturer of more than 1,050 copies of Benjamin Bunny or 511 units of Pulsator. These programs were patently too good to be true. Petitioners made no effort to follow up on their dealings with Cambridge and Aim Record or Century and Aim Software until investigation of their tax liabilities commenced. The facts speak for themselves. It would give undue dignity to petitioners' claims to belabor them or to repeat here what this Court and others have had to say about comparable situations in which we have repudiated "the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along." Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). The long and short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably *330 structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. * * * [Barnard v. Commissioner,731 F.2d at 232.] See also Elliott v. Commissioner,84 T.C. at 247-248. With respect to the ceramics and quilting activity, petitioner Marjorie Harmon's description of the manner in which she made incidental sales to friends or acquaintances at her estimated cost of those sales establishes that she did not have an actual and honest profit objective with respect to these activities.Because she had gross income from that activity, however, she is entitled to deductions to the extent of gross income for ordinary and necessary expenses incurred during 1982. Section 183(b)(2). Petitioners have not, however, produced any testimony or documentary evidence to satisfy their burden of proving that they actually incurred any deductible expenses in relation to this activity beyond the amounts allowed by respondent. Thus no additional deductions can be allowed. Investment Tax Credits
*331 Section 48(d)(1) provides as follows: (1) General Rule. -- A person (other than a person referred to in section 46(e)(1)) who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary) elect with respect to any new section 38 property * * * to treat the lessee as having acquired such property for an amount equal to -- (A) except as provided in subparagraph (B), the fair market value of such property, or (B) if the property is leased by a corporation which is a component member of a controlled group (within the meaning of section 46(a)(6)) to another corporation which is a component member of the same controlled group, the basis of such property to the lessor. Sections 1.48-4(f) and (g), Income Tax Regs., set forth the manner in which the lessor may make the election referred to in section 48(d). The election is made by filing a statement with the lessee, signed by the lessor and including the written consent of the lessee, on or before the due date (including any extensions of time) of *332 the lessee's return for the taxable year. Petitioners' return was filed in January 1983, no doubt because they were expecting large refunds. The return otherwise was not due until April 15, 1983. The elections by the lessors, however, were not signed until May 1983. They were, therefore, technically invalid; and the requirements for the lessees to receive credit under section 48(d) were not met. In addition, section 48(d) assumes eligibility for credit under sections 38 and 46, which in turn require that property be placed in service during the taxable year. Section 46(c). Petitioners have not shown that either Benjamin Bunny or Pulsator was even in existence prior to 1983. Finally, section 48(d)(1), supra, limits the amount eligible for the investment tax credit to the fair market value of the property acquired by the lessee. Thus, in order to establish their entitlement to investment tax credit, petitioners had the burden of proving the fair market value of Benjamin Bunny and of Pulsator. *333 They offered no evidence on this issue. The appraisals provided to them by Cambridge and Century were admitted only to show that petitioners had received them, which was relevant to whether or not they had an actual and honest profit objective, as discussed above, and whether or not they were negligent, as discussed below. Those appraisals in any event did not determine fair market value, i.e., the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion and both having reasonable knowledge of relevant facts. This is the comprehensive and long standing definition of fair market value and has been used in innumerable contexts. See, e.g., United States v. Cartwright,411 U.S. 546, 551 (1973); In re Williams' Estate,256 F.2d 217, 218 (9th Cir. 1958); Chiu v. Commissioner,84 T.C. 722, 730-733 (1985).These appraisals merely discussed the (unrealistically) projected income streams purportedly to be received in the future. For any and all of the foregoing reasons, petitioners *334 have failed to establish their entitlement to the investment tax credits claimed. Additions to Tax
Section 6653(a)
Because the additions to tax were raised by respondent by Amendment to the Answer, he has the burden of proof as to each of them. Rule 142(a), Tax Court Rules of Practice and Procedure. For the several reasons set forth above, including failure to comply with regulations prescribing timely elections by the lessors, and grossly exaggerated and wholly unsupported claims of fair market value, petitioners are not entitled to the investment tax credits claimed. Those reasons also lead to the conclusion that respondent's burden to establish negligence under section 6653(a) for 1979 and under section 6653(a)(1) for 1982 has been satisfied. As stated by the Court of Appeals for the Ninth Circuit in another tax avoidance context, "[n]o reasonable person would have trusted this scheme to work." Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983). The addition to tax for 1979 is applicable if any part of the underpayment is due to negligence. As applicable to 1982, section 6653(a) is divided into two parts, (1) and (2), as follows: *335 (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, *336 the date of the payment of the tax). As to the underpayment for 1982 attributable to disallowed deductions, respondent has not satisfied his burden of proof as to the section 6653(a)(2) additional amount. Except to the extent that they are disallowed for lack of substantiation, the deductions represent payments actually made by petitioners, and they are disallowed on a ground that was not necessarily foreseeable to petitioners, i.e., lack of profit objective. They relied, although unwisely, on Pratt, and he was familiar with all of the facts.The addition to tax under section 6653(a)(2), therefore, does not apply to these items. It does apply, however, to that portion of the underpayment that is attributable to the disallowed investment tax credits. Section 6659
Respondent also seeks an addition to tax for an underpayment attributable to a valuation overstatement, section 6659, and has the burden of proof on that issue. We have no doubt that the amounts set forth on petitioners' 1982 return as qualified investment for purposes of section 48(d) were grossly overstated. In addition, as set forth above, the investment tax credits are not allowable in this case for *337 three reasons, i.e., the lessors' elections to pass through the investment tax credit were not timely filed; petitioners did not prove that either property was placed in service during the taxable year; and petitioners did not prove the fair market value of either property. Like the appraisers whose opinions as to value were provided to petitioners in 1983, respondent's experts failed to support any conclusion of fair market value in terms of the price at which the property would change hands between a willing buyer and a willing seller, each having reasonable knowledge of relevant facts. We need not, therefore, accept their conclusions. See Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. Both Benjamin Bunny and Pulsator existed; even though promotional and contractual arrangements were unreal, the properties were not fictitious. Respondent has not satisfied us that the actual fair market value of each property is zero (or not more than $500 for Benjamin Bunny), as testified to by his experts. The amount of the overstatement, and the *338 deficiency attributable thereto, cannot, therefore, be determined for purposes of section 6659. Section 6661
Section 6661 provides: SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY. (a) Addition to Tax. -- If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 10 percent of the amount of any underpayment attributable to such understatement. (b) Definition and Special Rule. -- (1) Substantial understement. -- (A) In general. -- For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year or, (ii) $5,000. * * * (2) Understatement. -- (A) In general. -- For purposes of paragraph (1), the term *339 "Understatement" means the excess of -- (i) the amount of the tax required to be shown on the return for the taxable year, over (ii) the amount of the tax imposed which is shown on the return. (B) Reduction for understatement due to position of taxpayer or disclosed item. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. (C) Special rules in cases involving tax shelters. -- (i) In general. -- In the case of any item attributable to a tax shelter -- (I) subparagraph (B)(ii) shall not apply, and (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the *340 taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. (ii) Tax shelter. -- For purposes of clause (i), the term "tax shelter" means -- (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. (3) Coordination with penalty imposed by section 6659. -- For purposes of determining the amount of the addition to tax assessed under subsection (a), there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659 (relating to addition to tax in the case of valuation overstatements). Respondent has satisfied the requirements of this section. The facts found above and discussed in relation to the taxpayers' activity (or inactivity) with respect to Benjamin Bunny and *341 Pulsator compel the conclusion that the principal purpose of the investment plans or arrangements entered into with Cambridge and Century were the avoidance or evasion of Federal income tax. These arrangements fall within the definition of tax shelters; the dollar amounts are met; and none of the reduction provisions apply. Section 6621(d)
Finally, respondent seeks additional interest under section 6621(d), which provides: (d) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b). (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" *342 means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000. (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), * * * (B) Regulatory authority. -- The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account -- (i) the ratio of tax benefits to cash invested, (ii) the methods of promoting the use of this type of transaction, and (iii) other relevant considerations. (C) Effective date *343 for regulations. -- Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed. (4) Jurisdiction of Tax Court. -- In the case of any proceeding in the Tax Court for a redetermination of deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions. As discussed above, petitioners are not entitled to the investment tax credits that they claimed for various reasons, including the lack of timely elections by the lessors; the failure to establish that the property was placed in service during 1982; or the failure of petitioners to establish the fair market value of the property. Because respondent has also failed to prove the fair market value of either property, we cannot determine the amount of deficiency "attributable" *344 to the overvaluation. Compare Johnson v. Commissioner,85 T.C. 469, 484 (1985), where "the valuation overstatements were the sole source and cause of petitioners' deficiency." In this case, therefore, the additional interest will not be applied to the disallowed investment tax credits. Expenses relating to Mrs. Harmon's ceramics and quilting activities were disallowed because petitioners did not prove that they were entitled to deductions against income from that activity beyond those allowed by respondent. The portion of the deficiencies attributable to those disallowed expenses do not come within the provisions of section 6621(d). In temporary regulations adopted on December 26, 1984, pursuant to section 6621(d)(3)(B), and stated to be applicable to interest accruing after December 31, 1984, respondent has indicated that "any deduction disallowed for any period under section 183" is subject to the provision for additional interest set forth in section 6621(d). Section 301.6621-2T, A-4(1), Proced. & Admin. Regs, 49 Fed. Reg. 59394 (Dec. 28, 1984). To the extent, therefore, that the deductions claimed by petitioners for "rental" ($13,000) and *345 "advertising" ($5,300) in relation to Benjamin Bunny and Pulsator have been disallowed because we find that petitioners were not engaged in those activities for profit, the temporary regulations provide that the deficiency attributable to those deductions is subject to additional interest under section 6621(d)(1). Unlike that portion of the deficiency represented by the disallowed investment credits, there is no alternative ground advanced by respondent and thus no question as to what defect this portion of the deficiency is attributable. The temporary regulations were adopted under the authority of section 6621(d)(3)(B) and (C), supra. We have found that the principal purpose of the investment plans or arrangements made by petitioners with respect to Benjamin Bunny and Century were the avoidance or evasion of Federal income tax. In other words, petitioners' activities with respect to Benjamin Bunny and Pulsator were tax motivated transactions. Thus application of the Temporary Regulations to the deficiencies attributable to disallowance of deductions relating to those activities is consistent with the statute's express provisions and implicit policy. Additional interest in *346 accordance with section 6621(d) will, therefore, apply to the deductions claimed by petitioners for rental and advertising in relation to Benjamin Bunny and Pulsator. The additional interest accrues after December 31, 1984, even though the transactions were entered into prior the date of enactment of section 6621(d). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), on appeal (2d Cir., Mar. 24, 1986). Decision will be enteredunder Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Iternal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The parties stipulated to various documents concerning Cambridge and Century, including tax returns of those entities. They have been disregarded in our findings because they are unreliable hearsay as to the issues in this case. In relation to the Court's denial of petitioners' motions for continuance, however, it is relevant that on July 5, 1984, a judgment was entered against Cambridge and Century, among others, on their consent, enjoining them under sections 7402 and 7408 from the organization or sale of abusive tax shelter programs, including, but not limited to, master recordings and master video games. There is no indication that a continuance for a reasonable time would increase the likelihood that petitioners would secure helpful evidence with the assistance of Cambridge or Century.↩
3. In addition, the Court holds session in Anchorage, Alaska, where petitioners requested that trial be held, only once a year. A short continuance, therefore, was not feasible.↩
4. Sec. 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) The financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation.↩ * * *