LAURENCE R. AND MARGARET E. ZIRKER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16762-85.     Filed October 30, 1986.

*Rex C. Bush*, for the petitioners.
*James B. Ausenbaugh*, for the respondent.

WHITAKER, *Judge*: This case was assigned to and heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7456 of the Code and Rules 180 and 181.[1] The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, *Special Trial Judge*: Respondent determined the following deficiencies in petitioners' Federal income tax:

| Year | Deficiency |
|------|-----------|
| 1981 | [2]$9,412 |
| 1982 | 5,915 |

In his notice of deficiency respondent disallowed claimed losses incurred by petitioners resulting from an investment in dairy cattle. Respondent also disallowed an investment credit claimed for 1981. By his answer respondent seeks additions to tax under section 6659 for valuation overstatements and further seeks additional interest under section 6621(d) on the grounds that the underpayments for 1981 and 1982 are attributable to a tax motivated transaction.[3]

The issues for decision are whether petitioners are entitled to the claimed loss in connection with their investment in Holstein dairy cattle and whether petitioners are subject to the additions to tax under section 6659 and to additional interest under section 6621(d).

### FINDINGS OF FACT

At the time they filed their petition, petitioners resided in Columbus, Ohio. Some of the facts have been stipulated and are incorporated herein by this reference.

---

[1] All section references are to the Internal Revenue Code of 1954 in effect during the taxable years in question unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] By Order dated June 13, 1986, the small tax case designation was removed since it became apparent that the amount of deficiency in dispute for 1981 exceeded $10,000 upon consideration of respondent's claim for additions under sec. 6659 (see note 3 *infra*). Sec. 7463(e); Rules 171 and 173.

[3] Since the petition in this case was filed under the small tax case procedure, no answer was filed in response to the petition. Rule 175(b). Counsel for petitioners did not object to respondent's motion for leave to file an answer making a claim for the addition to tax under sec. 6659 and increased interest under sec. 6621(d). Respondent's answer was filed on Feb. 14, 1986.

During 1981, petitioner Larry Zirker (petitioner) worked as a welder.

. Roy Tolson (Tolson), promoter of the investment and owner of Financial Futures, contacted petitioner and encouraged petitioner to invest in cattle. Petitioner had known Tolson for many years, and it was through Tolson that petitioner had previously invested in cattle in 1980. Tolson provided petitioner with a prospectus of expected income and expenses. According to the prospectus, petitioner could expect a return on his investment of $119,437 in 1981, and $126,795 in 1982. Tolson presented the investment as a cattle breeding program; however, the cows were also to be milked and the milk sold for profit.

. Before investing in the cattle, petitioner consulted with his friend Wayne Asay, a county extension agent in Wyoming. (A county extension agent is a governmental adviser to those involved in agricultural activity in the county.) Asay had no particular expertise in cattle or dairy farming. Nevertheless, Asay agreed that the cattle in which petitioner was interested were Holstein pedigrees and opined that they would be a good investment.

On June 24, 1981, petitioner entered into a purchase agreement whereby he agreed to purchase five registered Holstein dairy cattle. According to schedule A attached to the agreement, the total purchase price of the five cattle was $41,500.[4] It is not clear from the record what the purchase price of each separate animal was. The terms of the purchase were $2,500 in cash down; $2,500 due on a promissory note to be paid on closing; a second promissory note for $18,056; and a third promissory note for $18,444. The terms of the promissory note for $18,056 required payment in seven annual installments of $3,956. The promissory note for $18,444 required petitioner to pay that amount on January 1, 1988, together with interest at the rate of 9 percent per year on the unpaid principal.

The three notes given on June 24, 1981, were secured by cattle in the herd and were nonrecourse notes. In late 1981, Tolson sent petitioner new agreements to sign which altered

---

[4]At trial the parties stipulated that the cash value of the five cattle on June 24, 1981, totaled $9,600. The parties further stipulated that if the cattle were sold on credit, they would have been worth one-third to one-half more.

the security on the notes. Petitioner signed notes which indicated that he was personally liable for their repayment. These notes were dated June 24, 1981, although they were sent to petitioner in November 1981. The notes purported to change petitioner's liability from nonrecourse to recourse. Petitioner received no consideration from Tolson in exchange for petitioner's promise to be personally liable on the notes.

The original purchase agreement also contained a covenant by petitioner that he had a net worth in excess of $100,000 (exclusive of home, automobile, and furnishings) and that some portion of his 1981 income would be subject to a Federal or State tax of 50 percent. In addition, the original purchase agreement contained a clause in which petitioner acknowledged that anticipated tax benefits may not be realized as a result of changes in Federal tax laws.

According to the terms of the original purchase agreement and the schedule attached to it, petitioner could not sell, remove, destroy, or otherwise handle any cow without Tolson's written permission. Tolson and petitioner also entered into a management agreement whereby Tolson agreed to be responsible for management of the animals. Petitioner could not and did not operate or supervise the dairy, nor did he make any decisions affecting the cattle's breeding. Petitioner was never consulted on whether to artificially inseminate, which sire would be chosen, or which cattle would be bred. He never asked to exercise any control over these matters and had no say as to which cows would be sold, culled, or left in the breeding stock.

Petitioner spent only a minimal amount of time at the dairy. In the fall of 1984 he spent a few days building a fence at the dairy. Petitioner called Tolson from time to time to inquire about his investment.

Petitioners' gross receipts, total deductions and net farm loss as claimed on a Schedule F for 1981 and 1982 are as follows:

| Item | 1981 | 1982 |
|------|------|------|
| Gross receipts | $14,607 | $16,478 |
| Total deductions | 36,155 | 39,620 |
| Net farm loss claimed | (21,548) | (23,142) |

The specific Schedule F deductions claimed are as follows:

| Claimed farm deductions | 1981 | 1982 |
|---|---|---|
| Labor Hired | $1,994 | $2,819 |
| Repairs, maintenance | 159 | 247 |
| Interest | 5,943 | 7,130 |
| Rent of farm, pasture | 1,989 | 2,820 |
| Feed purchased | 8,846 | 7,914 |
| Supplies purchased | 481 | 972 |
| Breeding fees | 288 | 544 |
| Veterinary fees, medicine | 322 | 334 |
| Gasoline, fuel, oil | --- | 101 |
| Storage, warehousing | 5 | --- |
| Taxes | 110 | 437 |
| Insurance | 366 | 218 |
| Utilities | 449 | 579 |
| Freight, trucking | 466 | 161 |
| Transportation | 640 | 240 |
| Advertising | 140 | 63 |
| DHIA | 557 | 214 |
| Registration | --- | 60 |
| Subtotal | 22,755 | 24,853 |
| Depreciation[5] | 13,400 | 14,767 |
| Total Deductions | 36,155 | 39,620 |

Petitioners also claimed an investment credit for the taxable year 1981 in the amount of $3,037 reporting an adjusted basis in the cattle of $41,500.

In his notice of deficiency dated April 15, 1985, respondent disallowed the claimed farm losses in full. As a basis for disallowance, respondent's notice stated as follows:

(a) The Schedule F. losses claimed by you in 1981 and 1982, in connection with "Financial Futures", are disallowed in full because you have not established, in support of your claimed losses, that you acquired any equitable, legal or other interest in dairy cattle. The Schedule F losses reported by you are disallowed in full because none of the losses have been verified, substantiated or demonstrated to be properly reportable and allowable under any provision of the Internal Revenue Code of 1954. Additionally, the losses are disallowed for the reason that you have not established that:

(1) You were engaged in, or held the property for use in a trade or business or for production of income;

(2) The transaction whereby you purportedly acquired the property had economic substance or purpose other than avoidance of tax;

---

[5]For purposes of depreciation the "cost or basis" was reported in the amount of $41,500.

(3) you acquired a depreciable interest in the property in 1981;

(4) the property was placed in service in 1981;

(5) that any expenses claimed on your 1981 and 1982 tax returns, in connection with Financial Futures were paid or incurred; and

(6) that amount, if in fact paid or incurred, was an ordinary and necessary expense or was paid for the purpose claimed.

Furthermore, you have not established your basis, if any, in the property. In any event, your basis may not include unpaid portions of the nonrecourse financing which lacks economic substance and does not constitute a bonafide loan. Any losses with respect to the property are limited to the amount at risk as defined by the Internal Revenue Code of 1954. Neither have you established that any expenses, if paid or incurred, were not capital expenditures and, therefore, not currently deductible. Accordingly, your taxable income for 1981 and 1982 is increased $21,548 and $23,142, respectively. Additionally, your tax liability for 1981 is increased $3,037, the amount of Investment tax credit claimed with respect to the dairy cattle, which is being disallowed for the reasons stated above.

## OPINION

We must decide whether petitioner is entitled to the claimed loss and investment credit in connection with his investment in Holstein dairy cattle.

In support of his position, respondent relies on *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975).[6]

Petitioner bears the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933). Petitioner maintains that his investment in cattle was a profit motivated investment spurred by his desire to leave the welding profession and lead an easier lifestyle. Therefore, he argues that he is entitled to the deductions claimed in connection with the dairy cattle. For the reasons set forth below, we find for respondent.

Our initial inquiry is whether a sale of the five Holstein cows ever occurred. It is axiomatic that the economic substance of a transaction governs over its form. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Estate of Franklin v. Commissioner, supra.* A sale generally occurs for tax purposes when there is a transfer of property for money or a promise to pay money. *Commissioner v. Brown*, 380 U.S.

---

[6]In support of his theory that petitioners never acquired an interest in the cattle or a genuine indebtedness to purchase the cattle, respondent cites *Ramirez v. Commissioner*, T.C. Memo. 1982-608; *Hunter v. Commissioner*, T.C. Memo. 1982-126.

563, 570-571 (1965). As we have stated previously, the key to determining whether a sale occurred in factual situations like the one presented here depends on whether the benefits and burdens of ownership passed from the purported seller of the cattle to the taxpayer. See, e.g., *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). This determination is a factual one based on all of the facts and circumstances. *Leahy v. Commissioner*, 87 T.C. 56 (1986); *Derr v. Commissioner*, 77 T.C. 708 (1981); *Grodt & McKay Realty, Inc. v. Commissioner, supra*; *Haggard v. Commissioner*, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).

There are several factors to be considered in determining whether what is purported to be a sale in form is also a sale in economic substance.[7] The first is to consider whether the stated price for the property is within a reasonable range of its value. According to the purchase agreement, petitioner was to pay Tolson $41,500 for five cows which petitioner now agrees were worth $9,600. The sales price of the cattle (if purchased for cash) was over four times the fair market value, and their sales price (if purchased on credit) was nearly three times the fair market value.[8]

The next factor to consider is whether the purported purchaser had any control over the property and, if so, to what extent. As we have already found, petitioner could not determine what cows would be inseminated or culled; he could not remove or sell any of the cattle without Tolson's written permission; and he did not know the actual extent of his control over the cattle.

Petitioner could not choose to house and care for the cattle at a facility of which Tolson did not approve. Tolson actually retained control of the cattle. Indeed, the registration certificates of the cows reflect Trydale Dairies as owner of the cattle. Tolson originally bought the cattle from Trydale Dairies.

----

[7]See *Hunter v. Commissioner, supra*.

[8]Petitioner stipulated that the actual fair market value of the cattle was $9,600 or one-half to one-third more if purchased on credit. Utilizing the figure most favorable to petitioner we take one-half of $9,600 or $4,800 and add the two figures together to arrive at $14,400. This amount is the maximum stipulated value of the cattle if purchased on credit. Yet on their Federal income tax returns for 1981 and 1982, petitioners reported the basis of the cows for purposes of depreciation to be $41,500.

Next, we must determine whether there was any intent that the stated purchase price of property would ever be paid. Petitioner's evidence on this point is insufficient to prove either the intention to pay, or the actual payment of, the full purchase price required by the agreement. Petitioner provided some services to the dairy in 1984 by helping to build a fence. Nevertheless, petitioner has not established the value of his services, nor can we make any finding regarding the value based on the record. As to any other amounts, petitioner offered no credible evidence that he had actually made yearly payments. No canceled checks or contemporaneous documentation was offered. The only evidence submitted to substantiate payment was a list from Tolson itemizing the payments.[9] Based on the entire record, we find that petitioner paid $2,500 on June 24, 1981 and an additional $2,500 in 1982.

Moreover, petitioner claims to be personally liable on the notes given to Tolson. In late 1981, Tolson wrote petitioner and asked him to sign a new set of promissory notes. Tolson explained that because of changes in the law under the Economic Recovery Tax Act of 1981, in order to preserve any anticipated tax benefits, petitioner had to re-sign the notes which were backdated to June 24, 1981. The record does not support the conclusion that petitioners would have or could have been called upon to pay the notes personally. These backdated notes which purport to change the character of petitioner's liability from nonrecourse to recourse are merely illusory and have no effect.

Finally, the last criterion is whether the purchaser will receive any benefit from the disposition of the property. Looking at petitioner's involvement in the investment, it is clear that petitioner did not have a profit objective. Despite his assertion that his investment was intended to secure his financial future, petitioner never inquired of Tolson when the investment would become profitable.

We are satisfied that this transaction was not a sale for Federal tax purposes. The transaction was so lacking in economic substance that it should not be recognized.

---

[9]Tolson furnished petitioner a list of payments specifically for purposes of the trial. A payment list prepared by the promoter a week before trial is hardly adequate to prove payment. Despite the fact that respondent did not object to the admission of this document, we need not rely on it. We accord little weight to this evidence.

Petitioner entered into the transaction in an attempt to obtain tax benefits. Accordingly, respondent's determination is sustained and the claimed losses are disallowed.[10] *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237, 1243 (1981).[11]

*Section 6659*

Respondent made claim in his answer for a valuation overstatement pursuant to section 6659. The burden of proof is on respondent since such claim was not included in the notice of deficiency and, therefore, is a new issue seeking an increased deficiency. Sec. 6214(a); Rule 142(a).

Section 6659 provides for an addition to tax if a taxpayer has an underpayment of tax which is attributable to a valuation overstatement. The addition to tax is an amount "equal to the applicable percentage of the underpayment so attributable." Sec. 6659(a). Section 6659(c) defines a valuation overstatement as follows:

(c) VALUATION OVERSTATEMENT DEFINED.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).

The applicable percentage is set forth in section 6659(b) as follows:

(b) APPLICABLE PERCENTAGE DEFINED.—For purposes of subsection (a), the applicable percentage shall be determined under the following table:

| If the valuation claimed is the following percent of the correct valuation— | The applicable percentage is: |
|---|---|
| 150 percent or more but not more than 200 percent . . . . . | 10 |
| More than 200 percent but not more than 250 percent. . . | 20 |
| More than 250 percent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |

The adjusted basis of the cattle claimed on the return was $41,500. We have found that no sale occurred. Since no sale occurred and title did not pass it follows that petitioner's "correct" adjusted basis in the cattle is zero. *Grodt &*

[10]We note that the notice of deficiency disallows the Schedule F losses and not all claimed deductions. Since there was income reported for both of the years in issue and respondent disallowed claimed losses rather than all claimed deductions, the effect of sustaining respondent's determination is to allow some of the claimed deductions in an amount which is equal to the income reported. (See schedule at pp. 973 and 974 of this opinion.)

[11]See also *Hunter v. Commissioner*, T.C. Memo. 1982-126.

*McKay Realty, Inc. v. Commissioner, supra.*[12] Thus, there is a valuation overstatement since the adjusted basis claimed on the return exceeds the correct adjusted basis by at least 150 percent. Sec. 6659(c). Since the valuation overstatement exceeds 250 percent, the applicable percentage is 30 percent.

Having determined that there is a valuation overstatement, we must next determine whether the entire underpayment is attributable to the valuation overstatment or, if not, what portion of the underpayment is attributable thereto. In order to make this determination we are required to examine how the valuation overstatement affects the disallowed loss. Since the loss is comprised of various deductions, we look first to those deductions which are directly affected by the determination of the valuation overstatement.

The result of a finding of a zero adjusted basis causes a disallowance of the depreciation deduction for both years in issue as well as a disallowance of the investment credit claimed for 1981. The allowance of depreciation and investment credit are both dependent on a taxpayer establishing a basis in property. Secs. 38(c)(1) and 48(c)(3)(B) (investment credit) and secs. 167(g), 1011(a) and 1012 (depreciation); see also *Zuanich v. Commissioner*, 77 T.C. 428 (1981). Thus, to the extent the underpayment is due to the disallowed depreciation deductions and disallowed investment credit, the underpayment is "attributable to" a valuation overstatement and subject to the addition imposed by section 6659. Since the depreciation deductions for each year and the investment credit for 1981 are of a lesser amount than the total claimed loss for each year, we must decide whether any other portion of the disallowed loss (creating the underpayment) is "attributable to" a valuation overstatement.[13]

---

[12]The nonrecourse debt which unreasonably exceeds the value of the cattle is not considered a valid debt and, accordingly, does not constitute an investment in the cattle. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976) affg. 64 T.C. 752 (1975); *Waddell v. Commissioner*, 86 T.C. 848, 898-903 (1986); *Noonan v. Commissioner*, T.C. Memo. 1986-449.

[13]The net farm losses claimed were $21,548 and $23,142 for 1981 and 1982, respectively. The depreciation claimed was $13,400 and $14,767 for those years, respectively. The investment credit claimed for 1981 was $3,037. The remaining expenses deducted by petitioners on their Schedule F, which comprise the claimed losses, relate to operating expenses as well as interest, insurance, and other items. (See pp. 973 and 974 of this opinion *supra.*)

The reporting of an adjusted basis in the cattle of $41,500 and our finding of a correct adjusted basis of zero does not directly affect the remaining deductions for operating expenses claimed under section 162(a) and section 1.162-12(a), Income Tax Regs. The interest deduction claimed under section 163 likewise is not directly affected by a finding of a zero adjusted basis. These expenses have been disallowed because of our finding that for tax purposes no sale occurred and, therefore, petitioners did not own the cattle or operate a cattle farm. The interest expense is not deductible since no valid debt existed.[14] In addition, petitioners did not offer any evidence that they paid the claimed expenses.

Accordingly, we look to determine whether these claimed deductions are affected by the finding of a valuation overstatement in some other way. In this regard we note that one of the ingredients in our finding that the transaction was not a sale for tax purposes was that the stipulated fair market value of the cattle was substantially less than the adjusted basis reported on the return.[15] However, we do not view this as a valuation overstatement as defined in section 6659(c) for purposes of this case. Section 6659(c) provides that there is a valuation overstatement if (1) the value of any property, *or* (2) the adjusted basis of any property, *claimed on any return* is 150 percent or more of the correct amount. In this case, petitioners claimed an adjusted basis in the cattle on their return for purposes of depreciation and investment credit. Thus, we cannot say that petitioners *claimed* a *value* on their *return* which we could use as a benchmark with which to compare the stipulated (correct) fair market value. See *Nielsen v. Commissioner*, 87 T.C. 779 (1986).

Since the only valuation overstatement in this case is based on our finding that the correct adjusted basis in the property was zero, rather than $41,500 as claimed on the return, which finding resulted from our conclusion that no sale occurred, it follows that the valuation overstatement is not an ingredient of, but rather the result of the finding that no sale occurred. Accordingly, the remaining disallowed deductions (creating an underpayment) which result from

---

[14]See note 12 *supra.*

[15]See note 8 *supra.*

the finding that no sale occurred are not attributable to a valuation overstatement.

*Section 6621(d)*

As discussed previously, with respect to section 6659, the applicability of section 6621(d) was first raised by respondent in his answer and thus the burden of proof is on respondent. Sec. 6214(a); Rule 142(a).

In his answer, respondent makes a claim for additional interest as follows:

7(e). Because of the valuation overstatement, the depreciation claimed on petitioners 1981 and 1982 Federal income tax returns are tax motivated transactions under the provisions of I.R.C. section 6621(d)(3)(i).

Section 6621(d) provides for an increase in the interest rate in respect of interest payable under section 6601 where there is a "substantial underpayment" (an underpayment of at least $1,000) "attributable to one or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the enactment of section 6621(d). *Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). A tax-motivated transaction includes "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(d)(3)(A)(i). *Stanley Works and Subsidiaries v. Commissioner*, 87 T.C. 389 (1986); *Johnson v. Commissioner*, 85 T.C. 469, 482 (1985); *Law v. Commissioner*, 84 T.C. 985, 989 (1985).[16]

Based on our finding that section 6659 is applicable, there is no doubt that section 6621(d) should also be applied. Sec. 6621(d)(3)(A)(i). Accordingly, the portion of the underpayment attributable to a valuation overstatement is subject to additional interest under section 6621(d).

Section 6621(d)(3)(A)(i) through (iv) sets forth circumstances other than a valuation overstatement as a tax-motivated transaction.[17] A question arises under the facts of this case whether any portion of the underpayment of

---

[16]See also *Hunter v. Commissioner*, T.C. Memo 1986-308; *Schachter v. Commissioner*, T.C. Memo 1986-292.

[17]See Temporary Regulations adopted Dec. 26, 1984. Sec. 301.6621-2T, [A-4], Proced. & Admin. Regs., T.D. 7998, 1985-1 C.B. 368, 49 Fed. Reg. 50390 (Dec. 28, 1984); see *Harmon v. Commissioner*, T.C. Memo. 1986-305; *DeMartino v. Commissioner*, T.C. Memo. 1986-263; *Forseth v. Commissioner*, T.C. Memo. 1985-279.

tax that is not attributable to the valuation overstatement is otherwise attributable to a tax-motivated transaction. In his claim, respondent specifically limits his allegations to the extent that the addition to tax under section 6621(d) is based on a valuation overstatement under section 6659. Respondent does not make a general claim under sec. 6621(d) that the additional interest should be applied on the premise that some portion of the underpayment was due to a tax-motivated transaction (other than a valuation over-statement).[18] Accordingly, we need not decide in this case whether any additional interest under section 6621(d) applies to any portion of the underpayment not attributable to the valuation overstatement since respondent has not made claim for it.[19] Sec. 6214(a); Rule 142(a); *Estate of Falese v. Commissioner*, 58 T.C. 895, 899 (1972).[20]

In order that the parties may compute the amount of the addition to tax under section 6659 and the additional interest under section 6621(d),

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, GOFFE, CHABOT, NIMS, PARKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, and WILLIAMS, *JJ.*, agree with this opinion.

WELLS, *J.*, did not participate in the consideration of this case.

---

[18]Respondent's allegations in his answer are even restrictive within the context of sec. 6659. Respondent refers only to depreciation and not to investment credit as a basis for application of sec. 6621(d)(3)(i).

[19]We note that this section has been amended by provisions of sec. 1535, Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535, 100 Stat. 2750, to include within its scope "(v) any sham or fraudulent transaction." The possible application of this amendment has not been suggested by respondent. Under the circumstances of this case, we need not resolve a question which has not been raised by one of the parties.

[20]*Lang v. Commissioner*, T.C. Memo. 1982-170; *Harris v. Commissioner*, T.C. Memo. 1969-49.