SAMUEL E. HUNTER AND JOAN C. HUNTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hunter v. Commissioner
Docket No. 10256-83.
United States Tax Court
T.C. Memo 1986-308; 1986 Tax Ct. Memo LEXIS 305; 51 T.C.M. (CCH) 1533; T.C.M. (RIA) 86308; July 23, 1986. Martin S. Ackerman,Stuart M. Bernstein and Benjamin Aerenson, for the petitioners. David M. Brandes,Barry Guberman and Diane Matualla, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: In the statutory notice of deficiency, respondent determined a deficiency in petitioners' 1979 Federal income tax in the amount of $13,329. [1] In his amended answer to the petition, respondent claimed a $4,949 increased deficiency (for a total deficiency of $18,278) and an addition to the tax under section *307 6653(a) [2] in the amount of $914. Further, respondent claims additional interest under section 6621(d), asserting that petitioners substantially underpaid their 1979 tax and that such underpayment was attributable to a tax motivated transaction. The issues for decision are: (1) the amount, if any, of the deduction to which petitioners are entitled for contributions of limited edition prints to various charitable institutions; (2) whether petitioners are liable for the addition to tax under section 6653(a); and (3) whether petitioners are liable for additional interest under section 6621(d). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated *308 herein by this reference. Petitioners Samuel E. Hunter and Joan C. Hunter, husband and wife, resided in New York, New York, at the time the petition herein was filed. During 1978 and 1979, Mr. Hunter was a vice president of the investment firm of Merrill Lynch Pierce Fenner & Smith; Mrs. Hunter was not employed. The amount of Mr. Hunter's 1979 income was substantial, and he was interested in sheltering that income from taxation. A friend of Mr. Hunter informed him of a program promoted by Martin Ackerman which involved the purchase and subsequent donation of works of art to museums. In early October, 1978, petitioners, together with others, met Mr. and Mrs. Ackerman at a breakfast meeting at the Ackermans' home. At the meeting, Mr. Ackerman discussed the tax benefits which could be derived by purchasing limited edition prints [3] for amounts less than their retail list prices and subsequently donating the prints to charitable institutions. Mr. Ackerman stated that Sovereign American Art Corporation (Sovereign), of which he was the president and of which his wife was the controlling shareholder, and its subsidiary, Rocquencourt, A.G., a Lichtenstein corporation (Rocquencourt), *309 had purchased a quantity of signed, limited edition prints at prices substantially less than their listed retail prices. Mr. Ackerman stated that these prints could be purchased from Rocquencourt for approximately one-third of their retail list prices and that if the purchasers thereafter contributed the prints to charitable institutions, [4] the contributors could obtain a tax deduction equal to approximately three times the purchase price. Petitioners told Mr. Ackerman that they were willing to spend a maximum of $10,000 on prints. They then accompanied Mr. Ackerman to the warehouse where the prints for sale were stored. The prints were spread out on tables, and petitioners selected *310 the following prints for purchase: 1. Herbert Bayer - 3 sets of 3 prints; 2. Sidney Nolan - 3 sets of 23 prints; each set consisted of a series of 14 different single prints, plus one work which alone consisted of 9 prints; 3. Lee Krasner - 3 sets of 3 prints; 4. Seymour Lipton - 3 sets of 3 prints; 5. Conrad Marca-Relli - 2 sets of 6 collage prints, "Autumn Suite"; 6. Beverly Pepper - 3 sets of 8 collage prints; 7. Larry Rivers - "Boston Massacre"; 8. Patrick Caulfield - "Jules LaForge"; and 9. Elizabeth Frink - "Aesop's Fables". Petitioners obtained the prints with the intention of donating some of them to charitable organizations and retaining some of them for their personal enjoyment. The prints purchased by petitioners had been acquired by Sovereign from Marlborough Gallery, Inc. (Marlborough) in August, 1978 at prices approximating Marlborough's cost, [5] i.e., one-sixth Marlborough's retail list prices. Sovereign then transferred ownership of the prints to Rocquencourt for resale to third parties. [6]
*311 Except for the prints by Sidney Nolan (which were selected on the basis of samples and at the time were located in England), all the prints selected were placed in a separate drawer with petitioners' name on it. Petitioners never had physical possession of the prints. The prints were insured by Sovereign under its bulk policy as goods sold but not delivered. Petitioners received an invoice from Rocquencourt for the prints, dated October 10, 1978, in the amount of $9,278. Petitioners paid $2,200 by check dated October 23, 1978, and gave a note for the balance. The note bore interest and was paid in March, 1979. All of the art purchased by petitioners, except for the works by Rivers, Caulfield and Frink, were donated at various dated in December, 1979 to various charitable institutions. The cost of shipping the prints to the institutions was paid by Sovereign, but the contributions were made in petitioners' names. Each donee institution sent petitioners a written acknowledgement with respect to the donated prints. The prints sold to Sovereign (and subsequently resold to petitioners) were "old" in that they had been held for sale by Marlborough for at least four years after *312 their publication and constituted excess inventory in the hands of Marlborough. The prints donated by petitioners in 1979 had initially been published by Marlborough as follows: Bayer
1969-1973
Nolan
1965-1972
Krasner
1969
Lipton
1969
Marca-Relli
1974
Pepper
1968
Most retail sales for a print edition take place within the first 2-3 years after publication. During the fall of 1978, Sovereign and Rocquencourt sold multiples of prints from the same editions by Bayer, Nolan, Krasner, Lipton, Marca-Relli and Pepper to 42 different purchasers, including the Hunters. Sovereign sold to 22 buyers and Rocquencourt sold to 20 buyers. In 1979, 38 of the 42 purchasers donated some of the prints purchased from Sovereign or Rocquencourt to charitable institutions, [7] and each of the 38 purchasers (including the Hunters) contributed $100 to the Foundation. Petitioners' cost for the prints *313 in 1978, and the claimed fair market value of the prints when donated to the institutions in 1979, are as follows: Claimed Fair
Cost
Market Value
Bayer
$ 788.68
$ 3,150.00
Nolan
3,395.96
13,500.00
Krasner
510.32
2,025.00
Lipton
343.31
1,350.00
Marca-Relli
1,512.41
6,000.00
Pepper
909.30
3,600.00
$7,459.98
$29,625.00
In their 1979 tax return, petitioners claimed a charitable contribution deduction in the amount of $36,875. The amount of the claimed deduction was based on a written appraisal for the prints, signed by Max Wykes-Joyce. [8] Mr. Ackerman had arranged for the appraisals, and the fee for the appraisal was paid for by Sovereign. At the time they filed their return, petitioners mistakenly believed that they had contributed the works by Rivers, Caulfield and Frink. Their mistake was due to the fact that a list of donated prints prepared by Mr. Ackerman, upon which petitioners relied in preparing their return, erroneously included prints by these three artists. Petitioners have since conceded that the works by Rivers, Caulfield and Frink were not in fact donated; their claimed contribution deduction is now $29,625. *314 Respondent contends that petitioners are not entitled to any charitable contribution deduction because petitioners never owned the prints they purported to donate. Rather, claims respondent, petitioners entered into a transaction with Mr. Ackerman solely to obtain tax benefits. Respondent claims the purported purchase and subsequent donations of the prints were devoid of economic substance and thus were sham transactions which cannot give rise to a charitable contribution deduction. Respondent argues in the alternative that if petitioners are entitled to a charitable contribution deduction, the amount of the deduction is less than that claimed because (1) petitioners did not satisfy the long-term holding requirement of section 170(e)(1)(A); (2) petitioners' activities were substantially equivalent to those of commercial art dealers; thus, the sale of the prints would have produced ordinary income and a reduction in the amount of the contribution is required under section 170(e)(1)(A); and (3) the fair market value of the prints at the time of contribution was not greater than the amount petitioners paid for them. Respondent also seeks an addition to the tax pursuant to section *315 6653(a) and an increased rate of interest pursuant to section 6621(d). ULTIMATE FINDINGS OF FACT (1) Petitioners owned the prints at the time (December, 1979) the prints were donated to various qualified institutions. (2) The fair market value of the prints contributed by petitioners in 1979 was $7,460. (3) Petitioners substantially underpaid their 1979 tax, which substantial underpayment was attributable to a tax motivated transaction, within the purview of section 6621(d). OPINION Section 170(a) allows as a deduction a contribution or gift to any entity described in section 170(c), [9] payment of which is made within the taxable year. Section 170A-1(c)(1), Income Tax Regs., provides that the amount of a charitable contribution that is made in property other than money shall be the fair market value of the property at the time of contribution, reduced as provided in section 170(e)(1). Section 1.170A-(1)(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any *316 compulsion to buy or sell and both having reasonable knowledge of relevant facts." See United States v. Cartwright,411 U.S. 546 (1973). Respondent contends that petitioners never owned any prints, that the transactions were mere shams and that petitioners merely purchased a tax deduction which promised a three-to-one write-off on their investment. Respondent first raised this argument in his amended answer; it is new matter, and therefore respondent bears the burden of proof with respect to this issue. Rule 142(a). In support of his claim, respondent points out that there was no written transfer of title from Sovereign to petitioners, that Sovereign retained physical possession of the prints, that the prints were insured by Sovereign, that the packaging and shipment of the prints to the various donee institutions was done by Mr. Ackerman and that Mr. Ackerman (acting on behalf of his foundation) made the necessary arrangements by which the donee institutions would accept the prints. *317 In order to make a deductible charitable contribution, a putative donor must first own the property that he purports to transfer. The right to beneficial enjoyment of the property, rather than possession of the property, determines whether a taxpayer is recognized as the owner of property for Federal tax purposes. Skripak v. Commissioner,84 T.C. 285, 316 (1985). A charitable contribution deduction is possible only after the gift has been delivered and only after the donor has parted with the dominion and control over the subject matter of the gift. Guest v. Commissioner,77 T.C. 9 (1981); Skripak v. Commissioner,84 T.C. at 318. In our opinion, petitioners owned the prints at the time of donation. The lack of formal conveyance of title to petitioners prior thereto is not determinative; [10] title passed not later than October 23, 1978, the date on which petitioners received the invoice and made payment therefor by check and a note. [11]
*318 As to respondent's contention that petitioners' tax-avoidance motive in making the contributions precludes allowance of the deductions, we shall repeat what we stated in Skripak v. Commissioner,84 T.C. at 319: [R]espondent's seeming obsession with the mechanics of these transactions as shams appears to be caused by the admitted tax-avoidance motivation of the various petitioners. However, as stated above, the deduction for charitable contributions was intended to provide a tax incentive for taxpayers to support charities. Consequently, a taxpayer's desire to avoid or eliminate taxes by contributing cash or property to charities cannot be used as a basis for disallowing the deduction for that charitable contribution. [Citations omitted.] Thus, we hold petitioners are entitled to a charitable contribution deduction for the donation of the prints. We must now determine the amount of the charitable contribution deduction to which petitioners are entitled. In determining the amount of the charitable contribution deduction to which petitioners are entitled, we must first determine whether the sale of the prints by petitioners would have produced ordinary *319 income to them. Section 170(e)(1)(A) provides that the amount of any allowable charitable contribution shall be reduced by the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value. Section 1.170A-4(b), Income Tax Regs., provides that "ordinary income property" includes property held by the donor primarily for sale to customers in the ordinary course of his trade or business. Respondent argues that petitioners' activities were substantially equivalent to those of a dealer in part works and that sale of the donated prints would therefore have produced ordinary income. We do not agree. As stated in our findings of fact, petitioners purchased the prints, in part, for the purpose of donating them to qualified institutions, and in part for personal enjoyment. Had the prints actually been sold, they would have produced long-term capital gain.Section 1221. In this sense, petitioners' purchase of the prints was no different from a purchase of stocks, stamps, gold, paintings, *320 sculpture, or any of a number of other investment properties. In any event, we think that the limitation of section 170(e)(1)(A) does not apply in the absence of a finding that the donor actually engaged in the trade or business of selling works of art to customers. Petitioners, who never sold any work of art, are not transformed into dealers by virtue of their donations. See Anselmo v. Commissioner,80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Petitioners are therefore entitled to a charitable contribution deduction equal to the fair market value of the donated prints at the time of the donation. In determining the fair market value of the prints, we must examine the market in which the prints are ordinarily sold to the ultimate consumer. Lio v. Commissioner,85 T.C. 56 (1985); Skripak v. Commissioner,84 T.C. at 322; Anselmo v. Commissioner,supra;Goldman v. Commissioner,388 F.2d 476 (6th Cir. 1967), affg. 46 T.C. 136 (1966). In Lio, we said, *321 "the sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale * * * and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved." Lio v. Commissioner,85 T.C. at 70. Based on the large number of sales by Sovereign and Rocquencourt in the Fall of 1978, of the prints by Bayer, Nolan, Krasner, Lipton, Marca-Relli and Pepper, the six artists involved in this case, the most active marketplace in 1978 for the prints herein involved was that created by Mr. Ackerman. Petitioners presented a plethora of evidence, including written appraisals of each artist's work and the testimony of three expert witnesses. Neither the appraisals nor the expert witnesses were persuasive. All experts failed to consider the price paid for the prints by petitioners. The most probative evidence of the fair market value of the prints is the amount petitioners paid for them, especially as their acquisition occurred only one year prior to the time of contribution. Chiu v. Commissioner,84 T.C. 722 (1985); Lio v. Commissioner,supra;Andrews v. Commissioner,38 F.2d 55 (2d Cir. 1930), *322 affg. 13 B.T.A. 651 (1928). Petitioners do not argue that any appreciation in value occurred from the date of acquisition to the date of contribution. Nor do we believe that any meaningful appreciation in value did occur. Hence, the fair market value of the prints on the date of contribution is the same as their fair market value on the date of acquisition by petitioners. As was noted in Estate of Kaplin v. Commissioner,748 F.2d 1109, 1111 (6th Cir. 1984), revg. a Memorandum Opinion of this Court, "[I]n determining the fair market value of property, little evidence could be more probative than the direct sale of the property in question." Petitioners' explanation of the differential between the amount they paid for the prints and the prints' claimed fair market value is that Mr. Ackerman's close relationship with Marlborough enabled him to purchase the prints at a substantial discount from the retail price which he, in turn, passed on to petitioners. According to petitioners, Sovereign, through Mr. Ackerman, purchased the prints from Marlborough at approximately *323 one-sixth of the retail price. Sovereign transferred the prints to Rocquencourt, who then sold the prints to petitioners at approximately one-third of the published retail value. Sovereign, through Mr. Ackerman, was able to acquire the prints at a substantial discount from Marlborough's published retail price due to the fact that prints were old and constituted excess inventory in the hands of Marlborough. It is clear to us that the transaction between Rocquencourt and petitioners was at arm's length, involving as it did a 100 percent markup by Rocquencourt. The record is devoid of any explanation of why Rocquencourt would sell the prints to petitioners for less than fair market value.Neither Sovereign nor Rocquencourt purported to be a nonprofit organization. If Rocquencourt sold the prints for approximately one-third of what it might otherwise have obtained, as petitioners claim, then such from an economic point of view, makes no sense. As we found in Chiu v. Commissioner,supra, we also find here no credible explanation as to why petitioners would be able to acquire the prints at substantial discounts from value. Thus, we believe that the fair market *324 value price of the prints in October, 1978 (as well as in December, 1979) was the price paid for them by petitioners. Petitioners rely heavily on Marlborough's price list to establish fair market values for the prints. Marlborough's price list is relevant, but we are not persuaded that it is the only indicator of fair market value. List prices do not reflect actual sale prices, rather only asking price. Further, the prices on the list, according to petitioners' own expert, were sometimes kept artificially high, out of "honor and sympathy" for an artist whose work might not sell if it appeared that it was declining in value. Petitioners submitted invoices which reflected actual sales by Marlborough and another gallery of single prints from the same editions at prices bearing some relationship to the published retail price. The gallery sales of single prints to dealers and non-dealers were incidental and do not reflect the prices commonly paid for these prints. Lio v. Commissioner,supra.
Multiples of prints from the same editions were sold by Sovereign and Rocquencourt during the fall of 1978 to at least 42 other buyers. Nothing in the record indicates that *325 those sales were any different, in terms of price, from the "bargain" obtained by petitioners. Respondent argues that the fair market values of the prints should be adjusted to reflect the fact that the value of the prints in the aggregate is less than the value of each individual print. If petitioners had placed all the prints on the market at the same time, claims respondent, the sudden availability of so many additional prints would have depressed the price of each print individually. We have held that where the simultaneous marketing of a large number of items would necessarily depress the market for each item, fair market value should be determined by applying a blockage discount to the retail price of the items. Jarre v. Commissioner,64 T.C. 183 (1975); Estate of Smith v. Commissioner,57 T.C. 650 (1972), affd. on another issue, 510 F.2d 479 (2d Cir. 1975), cert. denied 423 U.S. 827 (1975). Where, however, the number of items to be valued is only an insignificant portion of the total number of such items, we have held *326 that no blockage discount is appropriate. Anselmo v. Commissioner,supra.
We believe that a blockage discount is not warranted in this case. The number of prints purchased by petitioners represents only a small portion of the total number of prints within each edition, and an even smaller portion of the total work produced and outstanding by each artist. The marginal increase in supply which would have resulted from a sale by petitioners would not have seriously affected the prices of these prints. Considering all the evidence, we come to the conclusion, and find as an ultimate finding of fact, that the fair market value of the prints at the time of contribution by petitioners in 1979 was $7,460. Because respondent asserted an addition to the tax pursuant to section 6653(a) in its amended answer, respondent bears the burden of showing that petitioners' underpayment was the result of negligence or intentional disregard of rules or regulations. Rule 142(a). Based on the record before us, although petitioners' underpayment was due to their overvaluation of the prints, and their erroneous belief that they had contributed the prints by Rivers, Caulfield and *327 Frink, respondent has not borne his burden of proof. Thus, we hold that petitioners are not liable for the addition to tax under section 6653(a). We reach a different result with respect to respondent's claim that under section 6621(d) an increased rate of interest should apply. Section 6621(d) provides that interest which accrues after December 31, 1984 on a substantial underpayment attributable to a tax motivated transaction shall be 120 percent of the otherwise applicable rate. [12]Section 6621(d) applies only if a tax motivated transaction results in an underpayment in excess of $1,000. Section 6621(d)(2). A "tax motivated transaction" includes, among other things, any valuation overstatement, as defined in section 6659(c). Section 6659(c) defines a valuation overstatement as a claim on a return that the value of any property is 150 percent or more of the amount determined to be the correct value. Where multiple items of a similar nature are donated within the same taxable year, the aggregate value claimed by the taxpayer is compared to the aggregate value determined to be correct. *328 Neely v. Commissioner,85 T.C. 934 (1985). Here, petitioners' underpayment was attributable to a tax motivated transaction, i.e., a valuation overstatement within the meaning of section 6659(c), and the underpayment exceeds $1,000.Therefore, an increased rate of interest under section 6621(d) applies. To reflect the foregoing, and to give effect to petitioners' concession, Decision will be entered under Rule 155.
Footnotes
1. Petitioners conceded errors on their 1979 Federal income tax return. The parties stipulated that had respondent been aware of those errors, respondent's notice of deficiency would have reflected a 1979 tax deficiency in the amount of $14,282, rather than $13,329. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in 1979, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. A limited edition print is one of a finite, predetermined number of identical copies of an image, reproduced on paper. An edition may also be comprised of sets of prints, which may be sold as sets, or, in some cases, as single prints. ↩
4. Petitioners were advised that the Martin S. Ackerman Foundation would assist in facilitating the contribution of the prints to qualified institutions. For this assistance, it was expected that petitioners would make a modest cash donation to the Foundation.↩
5. Marlborough was the publisher and original distributor of most of the editions purchased. ↩
6. The purpose of using Rocquencourt to effect sales to third parties was to avoid the New York sales tax.↩
7. Approximately 90% of the Bayer prints, 50% of the Nolan prints, 85% of the Krasner prints, 85% of the Lipton prints, 60% of the Marca-Relli prints, and 80% of the Pepper prints which Sovereign or Rocquencourt sold in 1978 were donated to charitable institutions in 1979.↩
8. Each appraisal was signed by Mr. Wykes-Joyce, but was actually prepared by several people, including Mr. Ackerman. Mr. Wykes-Joyce did not testify at trial.↩
9. There is no dispute that the donation of the prints were made to entities described in section 170(c)↩.
10. N.Y.U.C.C. § 2-401(3)↩ (McKinney 1979). 11. Since petitioners owned the prints not later than October 23, 1978, and since the prints were donated to various charitable institutions in December, 1979, it is apparent that petitioners satisfied the long-term holding requirement of section 170(e)(1)(A)↩.
12. Respondent raised this issue by its pretrial motion dated January 23, 1985, a copy of which was served on petitioners. Although petitioners failed to address this issue on brief, they had adequate notice that we would consider the applicability of section 6621(d), and they presented at trial extensive evidence to support their valuation claim. See Johnson v. Commissioner,85 T.C. 469 (1985), distinguishing Law v. Commissioner,84 T.C. 985↩ (1985).