THE MARTIN S. ACKERMAN FOUNDATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martin S. Ackerman Foundation v. Commissioner
Docket Nos. 10261-83, 8264-84.
United States Tax Court
T.C. Memo 1986-365; 1986 Tax Ct. Memo LEXIS 238; 52 T.C.M. (CCH) 152; T.C.M. (RIA) 86365; August 11, 1986. Martin S. Ackerman and Benjamin Aerenson, for the petitioner. Lewis R. Mandel, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined the following deficiencies [1] in petitioner's Federal income taxes: Docket No.
Taxable Year Ended
Deficiency
10261-83
November 30, 1979
$2,850
8264-84 November 30, 1980
7,240 November 30, 1981
7,071 The issue for decision is whether during the years in issue petitioner satisfied the "operational test" of section 1.501(c)(3)-1(c), Income Tax Regs., and therefore qualified as an exempt organization under section 501(c)(3). [2]
*240 These cases were submitted fully stipulated under Rule 122. This reference incorporates herein the stipulation of facts and attached exhibits. Petitioner is a trust whose legal address was in New York, New York at the time the petitions herein were filed. Petitioner timely filed a return of Private Foundation Exempt from Income Tax (Form 990-PF) for each of its fiscal years ended November 30, 1979, November 30, 1980 and November 30, 1981. Petitioner is a small, private foundation with non-public sources of support, and was formed under the terms of a trust agreement dated December 18, 1967. During the taxable years at issue, Martin S. Ackerman ("Mr. Ackerman") was a practicing attorney, specializing in art related matters. His address and that of petitioner were the same. The Second paragraph of said agreement described, in pertinent part, that the purposes of the trust: are to devote and apply the property of this instrument vested in the [petitioner] and the income to be derived therefrom, exclusively for charitable, religious, scientific, literary or educational purposes, either directly or by contributions to organizations duly authorized to carry on charitable, *241 religious, scientific, literary or educational activities; provided however, that no part of this trust fund shall inure to the benefit of any private shareholder or individual, * * * Petitioner received a favorable determination letter from respondent, dated February 28, 1968, concluding it was exempt from Federal income tax as an organization described under section 501(c)(3). During the years in issue, Mr. Ackerman and his wife Diane L. Ackerman (sometimes referred to as "the Ackermans") served without compensation as trustees of petitioner and were also president and controlling stockholder, respectively, of Sovereign American Arts Corp. ("Sovereign"). Sovereign was a private art dealer also organized in 1968. Prior to its fiscal year ended November 30, 1979, all of petitioner's receipts came in the form of personal contributions from Mr. Ackerman and investment income generated therefrom. During its fiscal year ended November 30, 1979, petitioner received $9,000 in contributions from outside contributors consisting of 90 remittances, each in the amount of $100. During the fiscal years ended November 30, 1980 and November 30, 1981, petitioner received remittances totalling *242 $27,790 and $28,650, respectively, from outside donors. These individual contributions ranged in amounts from $100 to $200. Petitioner's tax returns show total receipts of $11,169 in fiscal 1979, $27,790 in fiscal 1980, and $31,725 in fiscal 1981. The majority of the remittances received during the 3 fiscal years at issue were made by individuals who had purchased paintings, books and other works of art from Sovereign or Sovereign's wholly owned subsidiaries (hereinafter collectively referred to as "Sovereign"). Mr. Ackerman, in his capacity as a trustee of petitioner, assisted such individuals in making contributions of all or part of this artwork. Such assistance consisted of: (a) Finding donee organizations to which the artwork could be contributed; (b) Writing to such donee organizations to see if they would accept such work; (c) Writing to donors with respect to such assistance and additional communications with the donee organizations; (d) Providing donors with a statement setting forth the name of the institution, a description of the work donated and the donor's valuation of the work, based on an attached appraisal. Petitioner also assisted donors and the recipient *243 institutions in arranging for packing and shipping of the works of art donated [3] and in many cases specified the periods during which the works of art were to be on loan to the donee institution prior to the finalization of the gifts. In lieu of his receiving a fee or other compensation for the assistance rendered to the donors, Mr. Ackerman requested that each donor make a contribution to petitioner in recognition of his assistance and in view of the fact that he was the founder of petitioner and one of its trustees. Some donors made such a contribution, others did not. None of the funds used to assist the donors who made such contributions came from petitioner, but rather from Mr. Ackerman, his wife or Sovereign. Similarly, none of the money so remitted was used in connection with such assistance or in any way related to the charitable contributions of such individuals, and all remittances were used in furtherance of petitioner's activities; except that funds of petitioner were used to pay the salary of Mr. Ackerman's *244 secretary who assisted him in correspondence with the donors and donee organizations. [4]
Petitioner did not publicly advertise the services it offered to individuals wishing to donate works of art to charitable and/or educational institutions during the years in issue. All the donors so assisted by Mr. Ackerman and petitioner learned about petitioner as a result of their social or professional contracts with Mr. Ackerman, or through other individuals with such contracts with Mr. Ackerman.Similarly, petitioner did not publicly advertise the services it offered to donee charitable and/or educational institutions during the years in *245 issue. Petitioner sent letters to various museums, libraries, and other such charitable and/or educational institutions advising them that it was in contact with donors willing to make available books, graphics, sculptures and other works of art as charitable gifts, and inquiring concerning the organization's interest in receiving such gifts. As a result of such letters, petitioner maintained a list of donee organizations to which donations of charitable gifts or works of art could be made. The individual donors who purchased their artwork from Sovereign or its subsidiaries were advised by either Mr. Ackerman or his wife, prior to their purchases, that petitioner, if they so requested, would be able to assist them in making a donation of the artwork they purchased to a charitable and/or educational institution. Sovereign sold the works of art to the individuals at a profit to itself. Petitioner never assisted individuals in the purchase of works of art. Petitioner, like other foundations, museums and "Friends Organizations" of such museums, did assist individuals who purchased works of art from Sovereign and diverse sources to make donations of such art to museums, art galleries, *246 libraries and universities throughout the United States (these organizations also being tax-exempt under section 501(c)(3), and contributions to these organizations being deductible under section 170). In addition to the assistance provided to those individuals who desired to contribute works of art to donee institutions, petitioner was also involved in other programs in support of public charities. These programs include direct contributions to, and payments made on behalf of, such charities in order to further their educational, cultural and other tax-exempt purposes. During its fiscal years ended November 30, 1979, November 30, 1980, and November 30, 1981, petitioner made contributions to such charities of $8,970, $7,140, and $22,384, respectively. [5] As of November 30, 1982, petitioner had total assets of $315,656. The sole issue for decision is whether during the years in issue petitioner satisfied *247 the "operational test" of section 1.501(c)(3)-1(c), Income Tax Regs., and thus qualified for exemption under section 501(c)(3). Section 501(c)(3) requires that an organization must be "operated exclusively for religious, charitable, scientific, * * * literary, or educational purposes," in order to be exempt from taxation under section 501(a). The "operational test," as set forth in respondent's regulations, provides that: [a]n organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.[Section 1.501(c)(3)-(1)(c)(1), Income Tax Regs. Emphasis added.] The regulations further provide that: [a]n organization is not * * * operated exclusively for one or more [exempt purposes] * * * unless it serves a public rather than a private interest. Thus, * * * it is necessary for an organization to establish that it is not * * * operated for the benefit of private interests such as *248 designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests. [Section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Emphasis added.] Respondent does not dispute that petitioner satisfies the organizational requirement of section 501(c)(3), and he expressly renounces any claim that section 502, dealing with "feeder" organizations, or section 512, dealing with unrelated business income, is involved herein. See Afro-American Purchasing Center, Inc. v. Commissioner,T.C. Memo. 1978-31. Respondent argues that the services petitioner provided in assisting individuals in making charitable contributions of artwork were in furtherance of a nonexempt purpose, because such services served the private interests of the individual donors and of Mr. Ackerman and his wife. He further asserts that such activity was substantial in nature, thus causing petitioner to run afoul of the requirements of section 1.501(c)(3)-1(c)(1), Income Tax Regs., and to lose its tax-exempt status. [6] Petitioner, on the other hand, contends that the services it provided were in furtherance of its stated *249 charitable purposes, and that any benefits that accrued to either the donors or to Mr. Ackerman and his wife were merely incidental to the public interests served by petitioner's assistance program. For the reasons discussed herein, we agree with respondent *250 The determination as to whether petitioner has satisfied the "operational test" is a question of fact. Goldsboro Art League, Inc. v. Commissioner,75 T.C. 337, 343 (1980). The burden of proof is on petitioner. Rule 142(a); see also Goldsboro Art League, Inc. v. Commissioner,supra at 342. The fact that the case was submitted as fully stipulated does not relieve petitioner of that burden. Cohen v. Commissioner,20 B.T.A. 647, 648 (1930). For ease of discussion, we will deal first with respondent's claim that the services provided by petitioner served the private interests of the individual donors, and then we will address the issue of the extent, if any, that these services personally benefitted Mr. Ackerman and his wife. With respect to the donors of the purchased artwork, we agree with petitioner that its activities do not rise to the high level of assistance which caused us to hold for respondent in Christian Stewardship Assistance v. Commissioner,70 T.C. 1037 (1978). At the same time, we believe that petitioner did more than merely put individuals seeking to donate works of art in touch with donee organizations. *251 The various services are set forth in our findings of fact, see pp. 4-5, supra, and were recognization by the donors through the payment of amounts ranging from $100 to $200. The fact that the donee organizations may have been the principal beneficiaries of petitioner's activities does not negate the flow of benefits to the donors. Christian Stewardship Assistance v. Commissioner,supra at 1042. Similarly, the fact that the expenses of providing such assistance came from the Ackermans or Sovereign rather than petitioner (other than its share of the cost of the secretary, files and a desk, see note 4, supra) all does not conclusively establish that such assistance did not benefit the donors, although it is an element in petitioner's favor in the sense that makes the "commercial hue," see Goldsboro Art League, Inc. v. Commissioner,supra at 342, less apparent. Finally, we note that a measurement of petitioner's role in assisting donors in relation to its overall activities can be found in the fact that the payments from donors constituted $9,000 (more than 80 percent of its total receipts) in fiscal year 1979, $27,790 (100 percent *252 of its total receipts) in fiscal year 1980, and $28,650 (more than 90 percent of its total receipts) in fiscal year 1981. [7] Under the foregoing circumstances, we are unable to conclude that petitioner's activities on behalf of donors of artwork fall within the ambit of cases holding that certain apparently nonexempt activities of an otherwise exempt organization were, relatively speaking, so insubstantial that the organization did not lose its exemption. E.g., Kentucky Bar Foundation v. Commissioner,78 T.C. 921 (1982); Goldsboro Art League, Inc. v. Commissioner,supra;Industrial Aid for the Blind v. Commissioner,73 T.C. 96 (1979). [8] Compare Copyright Clearance Center v. Commissioner,79 T.C. 793 (1982); Baltimore Health and Welfare Fund v. Commissioner,69 T.C. 554 (1978). *253 A similar analysis militates against the conclusion that petitioner's activities were not serving the private interests of Mr. Ackerman and his wife, either via Mr. Ackerman's law practice or via benefits to Sovereign of which they were president and controlling stockholder, respectively. Sovereign was an art dealer. The parties have stipulated that the majority of the donors who made payments to petitioner purchased the works of art, which they contributed to the donee organzations, from Sovereign. The stipulation of facts recites that there were 90 such donors in fiscal year 1979 and respondent has asserted, in his original brief, that there were approximately 200 such donors in each of fiscal years 1980 and 1981. Petitioner did not dispute this assertion in its reply brief, and the stipulated exhibits support the 200 figure. The record, however, is devoid of any evidence as to the total number of purchases of works of art from Sovereign and the volume of Sovereign's annual sales, so that we might determine the ratio of the dollar amounts of sales to donors who utilized the services of petitioner (categorized as to those who paid for such services and those who did not) to *254 Sovereign's total sales. To be sure, the parties have stipulated that "petitioner did not assist individuals in the purchase of works of art" but they also stipulated that "prior to their purchases" the individuals were advised of the availability of petitioner's services and that Sovereign "sold the works of art to the individuals at a profit to itself." [9] As to the impact of petitioner's activities on Mr. Ackerman's law practice, we observe that the record contains no information of the extent of the professional relationships, in financial terms or otherwise, between Mr. Ackerman and the donors who learned about petitioner as a result of their professional contacts with Mr. Ackerman (see p. 6, supra). Thus the extent of the benefit to Mr. Ackerman in this respect cannot be determined and, as a consequence, we are unable to conclude that the benefits to the Ackermans were so insubstantial as not to jeopardize petitioner's exemption. *255 The long and the short of the matter is that the fully stipulated record and the inferences which can reasonably be drawn therefrom leave us with too many doubts to enable us to conclude that petitioner has carried its burden of proof that it did not, to a more than insubstantial degree, serve "a private interest." Section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Responsibility for the circumstances which lead us to our conclusions rests with petitioner. Conservative Gas Co. v. Commissioner,30 B.T.A. 552, 555 (1934); Cohen v. Commissioner,20 B.T.A. at 648. Cf. Lane-Wells Co. v. Commissioner,134 F.2d 977, 979-980 (9th Cir. 1943). See 2 Casey, Federal Tax Practice, sec. 7.38 at p. 239 (1981 rev.). [10]
*256 To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. Pursuant to an order dated April 23, 1985, docket Nos. 10261-83 and 8264-84 were consolidated for trial, briefing, and opinion. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
3. Although this finding is not contained in the stipulation of facts as such, it is clear from the stipulated exhibits that such assistance was provided.↩
4. Petitioner had no office of its own but shared the use of a secretary, files and a desk in the office of Mr. Ackerman, for which it is charged a cost. In addition to assisting with the aforementioned correspondence, Mr. Ackerman's secretary also kept the books of account, files and contracts, monitored petitioner's investments and prepared the tax and reporting forms of petitioner. She also assisted petitioner in administering its other programs in support of public charities.See p. 7, infra.↩ Her total cost to petitioner was $100 per week.
5. The recipients of these contributions are too numerous to mention, but covered a wide spectrum of institutions, including, but not limited to, art museums, universities, hospitals, a ballet company, public television, libraries, and various humanitarian organizations.↩
6. Respondent does not argue that the activities of petitioner violated the requirement of section 501(c)(3) that "no part of the net earnings of [petitioner] inures to the benefit of any private shareholder or individual." See also sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. This requirement and that of sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., relating to "a public rather than a private interest" are separate requirements (see Canada v. Commissioner,82 T.C. 973, 981 (1984), and Aid to Artisans, Inc. v. Commissioner,71 T.C. 202, 215 (1978)), although there are elements common to both ( Goldsboro Art League, Inc. v. Commissioner,75 T.C. 337, 345 n. 10 (1980)). In view of respondent's position, we need not directly address the question whether the "inurement" requirement reaches beyond situations where private interests receive benefits from the distribution of funds or the use of art organizations' property. Compare Canada v. Commissioner,supra.↩
7. Comparable figures for petitioner's contributions are $8,970 for fiscal year 1979, $7,140 for fiscal year 1980, and $22,384 for fiscal year 1981. We note that each of these amounts is less than the amounts of the payments from donors.↩
8. See also Fraternal Medical Specialist Services, Inc. v. Commissioner,T.C. Memo. 1984-644↩.
9. Petitioner seeks to buttress its case by arguing that, in many instances, art dealers sit on boards of exempt organizations, and consequently, are in a position to benefit business-wise by helping their customers contribute works of art to the exempt organizations which they serve. Aside from the fact that the record contains no evidence as to this aspect of dealings in the art world generally, we observe that the relationship of such art dealers to the exempt organizations is not likely to have more than an insubstantial impact on the exempt activities of institutions which serve the general public.↩
10. Petitioner, on brief, discusses the difficulties which small museums encounter in meeting competition for donation of works of art from larger museums. We are not persuaded that such is the case, much less that this situation is so well-known that it can be properly taken into account in the absence of evidence of record. We have similarly disregarded respondent's assertion on brief that the value placed on donated art work by donors was significantly higher than the purchase price paid to Sovereign or its subsidiaries; we have been unable to find any evidence of record to support respondent's assertion and respondent has not indicated where any such evidence exists. Compare Hunter v. Commissioner,T.C. Memo. 1986-308↩.