T.C. Memo. 2014-99

UNITED STATES TAX COURT

RERI HOLDINGS I, LLC, HAROLD LEVINE, TAX MATTERS PARTNER,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9324-08.                    Filed May 22, 2014.

LLC contributed a successor member interest in another LLC to University. TMP moves for partial summary judgment that, as a matter of law, the doctrines of "sham" and "lack of economic substance" are not applicable to the determination of whether a taxpayer's charitable contribution deduction is allowable under I.R.C. sec. 170.

<u>Held</u>: TMP's motion will be denied.

<u>Randall Gregory Dick</u> and <u>Rebekah E. Schechtman</u>, for petitioner.

<u>Travis Vance III</u>, <u>Kristen I. Nygren</u>, <u>John M. Altman</u>, and <u>Leon St. Laurent</u>, for respondent.

[*2]                    MEMORANDUM OPINION

HALPERN, Judge:  This is a partnership-level action brought in response to a notice of final partnership administrative adjustment.  The action involves RERI Holdings I, LLC (RERI).  On its 2003 income tax return RERI reported a charitable contribution of property worth $33,019,000.  Respondent determined that RERI overstated the value of the contribution by $29,119,000.  He also determined that, on account of the overstatement, he would apply an accuracy-related penalty to any resulting underpayment of income tax.  Petitioner assigned error to respondent's determinations.  Respondent answered, supporting his determination that RERI had overstated the value of the contribution with the allegation that the transaction giving rise to RERI's charitable contribution "is a sham for tax purposes or lacks economic substance, and therefore the transaction should be disregarded for federal tax purposes and the deduction disallowed in its entirety."

The case is presently before us on petitioner's motion for partial summary judgment (motion).  Petitioner moves for partial summary adjudication in his favor "that the doctrines 'sham' and 'lack of economic substance' are not applicable to the determination of whether a taxpayer's contribution to charity is allowable under

**[*3]** I.R.C. § 170."  Petitioner has, thus, raised an issue of law with respect to which a partial summary judgment is appropriate.  See Rule 121(a) and (b).[1]  Respondent objects to our granting the motion.  We will deny the motion.

## Background

Previously in this case we disposed by order of a motion by respondent for partial summary judgment.[2]  In doing so we relied on certain facts that we believed were not in dispute.  The parties do not dispute any of those facts; in fact, petitioner relies on a portion of those facts in support of the motion.  We shall, therefore, with minor modifications and additions as relevant to the motion, again rely on those facts.  The facts we rely on are as follows.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2003, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent moved for partial summary adjudication in his favor that, if the valuation tables provided for in sec. 7520 are to be used in valuing the charitable contribution in issue, the challenged contribution must be reduced by (1) depreciation and (2) the entire amount of the mortgage indebtedness encumbering the underlying property.  By order dated May 5, 2011, we granted that motion with respect to respondent's first prayer and denied it with respect to his second prayer.  We denied the motion with respect to respondent's second prayer on the ground that there was a genuine dispute as to a material fact.  See Rule 121(b).

**[*4]** RERI

RERI was formed as a Delaware limited liability company on March 4, 2002. It was dissolved on May 11, 2004. RERI is classified as a partnership for Federal income tax purposes. For 2003, RERI filed a Form 1065, U.S. Return of Partnership Income (return).

The Charitable Contribution

RERI reported on the return as a charitable contribution its transfer to the Regents of the University of Michigan (University) of what RERI described on the return as "100% of the remainder estate in the membership interest in H.W. Hawthorne Holdings, LLC" (Holdings). Holdings, RERI reported, "owns all of the membership interest of a ['single purpose, single member'] Delaware limited liability company". That Delaware LLC is RS Hawthorne, LLC (Hawthorne), which RERI described on the return as owning "the fee simple absolute in a parcel of land improved as a AT&T web hosting facility located at 2301 West 120th Street, Hawthorne, California" (Hawthorne property).

Red Sea Tech I, Inc.

The Hawthorne property had come to be owned by Hawthorne on February 6, 2002, pursuant to Hawthorne's execution of a real estate contract that Hawthorne had received from Red Sea Tech I, Inc. (Red Sea). Hawthorne

[*5] purchased the Hawthorne property for $42,350,000. To fund that purchase, Hawthorne borrowed $43,671,739 from Branch Banking & Trust Co., securing its repayment obligation by, among other things, a deed of trust and an "Absolute Assignment of Rents and Lease". AT&T occupied the Hawthorne property pursuant to a triple net lease. That lease had commenced in December 2000 and was for a term of 15½ years, with three renewal options of 5 years each.

The Temporal Interests

Initially, Red Sea was the sole member of Holdings. On February 7, 2002, Red Sea created two temporal interests in Holdings--a possessory term of years member interest (TOYS interest) and a future, successor member interest (SMI). The TOYS interest commenced in February 2002 and is to run almost 18 years, through December 31, 2020. The SMI becomes possessory on January 1, 2021, on termination of the TOYS interest.

Sale to RJS and Purchase by RERI

RJS Realty Corp. (RJS) is a Delaware corporation. On February 7, 2002, RJS purchased the SMI for $1,610,000.

On March 25, 2002, RJS sold the SMI to RERI for $2,950,000, RERI paying $1,880,000 in cash and executing a nonrecourse promissory note for the balance.

**[*6]** <u>The Gift Agreement</u>

On August 27, 2003, RERI's principal investor, Stephen M. Ross, pledged that he would make a gift of $4 million (later increased to $5 million) to the University for the benefit of its Department of Athletics (gift agreement).

Under the gift agreement, Mr. Ross pledged and agreed "to transfer, or to have transferred" the SMI to the University no later than December 31, 2003. Upon receiving the SMI, the University was to hold it at a nominal value of $1 and credit Mr. Ross' pledge in the amount of $1. The University agreed to hold the SMI for a minimum of two years, "after which the University shall sell" the SMI and credit Mr. Ross' account "to a value equal to the net proceeds received by the University" for the SMI. RERI's donation of the SMI to the University was completed on the same day as the gift agreement, August 27, 2003. Consistent with the gift agreement, the agreement embodying RERI's donation of the SMI to the University required the University to hold the SMI "for a period of two years".

<u>Appraisal of the Hawthorne Property</u>

In September 2003, RERI retained Howard C. Gelbtuch of Greenwich Realty Advisors to appraise a remainder interest in the Hawthorne property. Mr. Gelbtuch concluded that the fair market value of "the leased fee interest in the * * * [Hawthorne] property as of August 28, 2003, is US $55,000,000", and that

[*7] the "investment value" of a remainder interest in that property vesting on

January 1, 2021, was $32,935,000.[3] Mr. Gelbtuch determined that value by

multiplying his determined value of the underlying leased fee interest by an

actuarial factor taken from the tables promulgated under sections 2031 and 7520.

See sec. 20.2031-7(d)(1), Estate Tax Regs. (2003); sec. 1.7520-1(a) (1), Income

Tax Regs. (2003).[4]

---

[3]The appraisal and professional fees were calculated as $84,000, for a total reported charitable contribution by the partnership of $33,019,000.

[4]Mr. Gelbtuch was asked to and did, in fact, appraise a remainder interest in the Hawthorne property, not the SMI. Petitioner defends Mr. Gelbtuch's appraisal of an interest in the Hawthorne property on the ground that both Holdings and its wholly owned subsidiary Hawthorne, which owned the Hawthorne property, were LLCs wholly owned by Red Sea. Therefore, he argues, they were "disregarded entities" pursuant to sec. 301.7701-3(b)(1)(ii), Proced. & Admin. Regs. He argues that our decision in Pierre v. Commissioner, 133 T.C. 24 (2009), in which we held that an LLC constituting a disregarded entity under the foregoing regulation may not be disregarded in valuing an interest in the LLC for Federal gift tax purposes, is applicable only for Federal gift tax purposes. Respondent states: "Inasmuch as this Court applied the willing buyer-willing seller test for fair market value to determine the value of the LLC interest transferred in Pierre, respondent accepts [and would apply to this case] the result in Pierre." Because it is not germane to the motion, we need not, and do not, address herein this dispute between the parties. We note, however, that that issue does reappear in connection with respondent's pending motion for partial summary judgment in which he argues that Mr. Gelbtuch failed to derive a value for the SMI and improperly applied the sec. 7520 tables to the fair market value of the leased fee interest in the Hawthorne property rather than to the fair market value of Holdings.

[*8] Sale of the SMI

On or about December 23, 2005, after the expiration of the required two-year holding period, the University sold the SMI for $1,940,000 to HRK Real Estate Holdings, LLC (HRK), a Delaware LLC indirectly owned by petitioner and an associate.[5]

HRK had pre-sold the SMI to a third-party individual for $3 million on or about December 20, 2005. On December 26, 2005, that third party donated the SMI to another charitable organization and claimed a charitable contribution deduction of $29,930,000 in connection therewith, again on the basis of an appraisal by Mr. Gelbtuch.

## Discussion

I. Introduction

Respondent would adjust RERI's reported charitable contribution from a little over $33 million to zero on the ground that the "transaction giving rise to the * * * [contribution] is a sham for tax purposes or lacks economic substance, and

---

[5]As a result of (1) petitioner's donation of the SMI to the University and (2) other donations to the University of similar properties arranged by Mr. Ross, the University realized $4,276,604 from sales of the donated properties which it credited to Mr. Ross' $5 million pledge. Respondent alleges that, at least with respect to some of those sales, the amounts realized by the University were far less than the appraisals of the properties for which the donors, presumably, claimed sec. 170 deductions.

[*9] therefore the transaction should be disregarded".  Petitioner moves that we summarily rule that "sham" and "lack of economic substance" are unavailable arguments in determining whether a taxpayer's charitable contribution qualifies for deduction pursuant to section 170(a).[6]

Generally speaking, the term "economic sham" (as opposed to the term "factual sham", i.e., a transaction that did not occur) describes a transaction that actually occurred but that exploits a feature of the Internal Revenue Code without any attendant economic risk.  See, e.g., Horn v. Commissioner, 968 F.2d 1229, 1236 n.8 (D.C. Cir. 1992), rev'g Fox v. Commissioner, T.C. Memo. 1988-570.  Respondent also cites Horn v. Commissioner, 968 F.2d at 1237-1238, for the proposition that a transaction lacks economic substance if the transaction had no reasonable prospect of earning a profit and was undertaken for no business purpose other than to obtain tax benefits.

Respondent does not argue that RERI did not in fact transfer property to the University or that the gift was not in fact a charitable contribution.  Indeed, he states:  "Respondent does not dispute whether RERI made a contribution or gift

---

[6]A partnership computes its taxable income without the deduction for charitable contributions provided for in sec. 170.  Sec. 703(a)(2)(C).  Nevertheless, each partner takes into account his distributive share of the partnership's charitable contributions.  Sec. 702(a)(4).

**[\*10]** within the meaning of section 170(c) when it assigned the successor member interest to the University on August 27, 2003." Nevertheless, respondent argues: "[T]he 'economic substance', 'sham', and 'substance over form' doctrines may be applied to disallow a charitable contribution deduction when the tax benefits claimed by a sham entity run counter to the legislative goals underlying section 170."

While the parties have voluminously briefed their positions, they have, for the most part, talked past each other. Petitioner, relying principally on our Opinion in Skripak v. Commissioner, 84 T.C. 285 (1985), argues that respondent, having conceded that there was an unrequited gift to a qualified recipient (the University), cannot freight section 170(a) with any inquiry into the bona fides of the gift or into RERI's purpose in making the gift. Respondent, relying principally on our Memorandum Opinion in Ford v. Commissioner, T.C. Memo. 1983-556, 1983 Tax Ct. Memo LEXIS 227, takes RERI under fire: "RERI was organized solely for tax avoidance purposes, lacked economic substance, was a sham, and is not a valid partnership for tax purposes under Commissioner v. Culbertson, 337 U.S. 733 (1949)." Neither argument precludes the other, so both may be right.

[*11] II.    The Parties' Arguments

A.    Petitioner's Argument

As stated, petitioner relies principally on Skripak.  In Skripak, the taxpayers participated in a book contribution program under which high-tax-bracket individuals purchased portions of a book publisher's excess inventory and, after holding the books for more than six months (the then long-term capital gains holding period), contributed them to various small, rural, public libraries.  The book contribution program was carried out with the assistance of a corporation, formed solely for that purpose, which located the individual donors and the donee libraries, purchased the books from the publisher, and resold them to the donors, each of whom, pursuant to an "offering memorandum" circulated among the potential donors, was "free to dispose of books * * * at any time, in any manner and to any person or entity selected by him * * * [with the expectation that] purchasers will use the books for the support of institutions in need by donating them to * * * [the libraries]."  The corporation offered to "arrange for and execute donations on behalf of * * * [the individual purchasers]."  The offering memorandum contemplated that participants would claim charitable contribution deductions equal to the publisher's "catalog retail list price", triple what they would pay for the books.  Skripak v. Commissioner, 84 T.C. at 293-297.

[*12] The Skripak taxpayers participated in the program, and the Commissioner denied their charitable contribution deductions, arguing that the "various documents purporting to evidence * * * [the taxpayers'] acquisition and disposition of the books * * * merely constitute a transaction wholly lacking in economic substance and reality, a sham transaction that should be completely disregarded for Federal tax purposes." Id. at 314. The Commissioner further argued that the individual taxpayers "neither owned nor contributed books to the libraries, and that any contributions * * * [were by the corporation, not the taxpayers]." Id. The Commissioner concluded that the taxpayers "purchased tax deductions, not books." Id. We rejected the Commissioner's argument that the taxpayers had "no chance of realizing an economic profit" under the program on the ground that such facts, even if true, were "not pertinent to our inquiry." Id. at 314-315. We stated the pertinent legal principles as follows:

> The deduction for charitable contributions provided by section 170 is a legislative subsidy for purely personal (as opposed to business) expenses of a taxpayer. Accordingly, doctrines such as business purpose and an objective of economic profit are of little, if any, significance in determining whether petitioners have made charitable gifts. We think that the various documents in fact comport with the economic substance and reality of these transactions, and we conclude that the petitioners did in fact own and contribute the books to the various libraries. [Id. at 315; citations omitted.]

**[*13]** We further noted that, because "the deduction for charitable contributions was intended to provide a tax incentive for taxpayers to support charities[,] * * * a taxpayer's desire to avoid or eliminate taxes by contributing cash or property to charities cannot be used as a basis for disallowing the deduction for that charitable contribution." Id. at 319. Therefore, we held that the taxpayers were entitled to deductions for their contributions of the purchased books to the libraries. Id. at 320.[7]

In further support of his argument that business purpose and economic substance are irrelevant with respect to the allowance of a charitable contribution deduction, petitioner also relies upon the following statement in Scheidelman v. Commissioner, 682 F.3d 189, 200 (2d Cir. 2012), vacating and remanding T.C. Memo. 2010-151: "It is true the taxpayer hoped to obtain a charitable deduction for her gifts, but this would not come from the recipient of the gift. It would not be a quid pro quo. If the motivation to receive a tax benefit deprived a gift of its charitable nature under Section 170, virtually no charitable gifts would be deductible." Petitioner argues that, because the partnership received nothing from

---

[7]We concluded, however, that the fair market value of the contributed books "was no more than 20 percent of the * * * [publisher's] catalog retail list prices", and we reduced the taxpayers' deductions accordingly. Skripak v. Commissioner, 84 T.C. 285, 329 (1985).

**[*14]** the University in exchange for its contribution, there was no quid pro quo and, hence, no basis for the complete disallowance of the deduction. Cf. Hernandez v. Commissioner, 490 U.S. 680, 690-691 (1989); United States v. Am. Bar Endowment, 477 U.S. 105, 116 (1986).

Lastly, petitioner notes that, on numerous occasions, the Court has affirmed that a taxpayer who acquires property for the sole purpose of making a charitable contribution is entitled to a section 170 deduction for the contribution. See, e.g., Maysteel Prods., Inc. v. Commissioner, 33 T.C. 1021, 1024-1025 (1960), rev'd on another issue, 287 F.2d 429 (7th Cir. 1961); Weitz v. Commissioner, T.C. Memo. 1989-99, 1989 Tax Ct. Memo LEXIS 99, at *25-*26; Hunter v. Commissioner, T.C. Memo. 1986-308, 1986 Tax Ct. Memo LEXIS 305, at *14.

B. Respondent's Argument

Respondent retorts:

Consistent with Skripak, respondent does not apply the economic substance or any other judicial doctrine in determining whether RERI made a charitable gift to the University. Nevertheless, this Court's opinion in Skripak does not preclude the respondent from relying on the "sham" and "lack of economic substance" doctrines in the instant case to disallow the $33,019,000 tax benefit RERI claimed on its 2003 Form 1065."

As stated, respondent relies principally on the analysis in our Memorandum Opinion in Ford v. Commissioner, T.C. Memo. 1983-556. In Ford, the taxpayer

[*15] husband was a limited partner in a partnership that indirectly (through a corporation) leased an underwater habitat, the Aegir, to the University of Hawaii (UH) for a nominal rent. The partnership later decided to donate the Aegir to UH and, to that end, it transferred the Aegir to a newly formed corporation (Makai) in exchange for all of Makai's outstanding stock. On the day of the transfer of the Aegir to Makai, the partnership donated its Makai shares to UH. On that day, the fair market value of the Aegir was $600,000, but, because the Aegir had by then been fully depreciated, it had a zero basis in the hands of the partnership. Thus, the partnership's outright contribution of the Aegir would have afforded it (or, more accurately, its partners) a zero charitable contribution deduction pursuant to section 170(e)(1)(A), which provides that a charitable contribution of property must be reduced by the amount of gain (in this case, section 1245 depreciation recapture) that would not be long-term capital gain on a fair-market-value sale of the property. On the basis of the partnership's contribution of the Makai stock to UH, the taxpayers claimed a charitable contribution deduction for the taxpayer husband's pro rata share of the partnership's contribution of the Makai stock (worth $600,000), subject only to the provisions of section 170(b)(1)(C), limiting the deduction to 30% of the taxpayers' "contribution base", as defined in section

**[\*16]** 170(b)(1)(E).[8] Makai conducted no business while it was owned by the partnership, and the Aegir was its sole asset. See Ford v. Commissioner, 1983 Tax Ct. Memo LEXIS 227, at \*1-\*11.

On the basis of those facts, we made the following "ultimate findings of fact": "The transfer of the Aegir by the partnership to Makai Corporation was carried out for the sole purpose of tax avoidance in order to gain a tax deduction for its partners through the donation of the Aegir to the University. Makai Corporation was a sham and acted solely as a conduit for the tax avoidance purpose." Id. at \*12. On the basis of those findings, we held that the partnership made a direct gift of the Aegir to the University (resulting in a zero contribution deduction for the taxpayers and the other partners in the partnership). Id. at \*18. We also found that Makai "was utilized for the sole purpose of tax avoidance and was without substance", citing caselaw standing for the proposition that "the tax

_____

[8]The fair market value deduction was, presumably, premised on (1) sec. 1223(1), which permitted the "tacking" of the partnership's holding period for the Aegir onto its holding period for the stock, thereby making the stock a long-term capital asset, and (2) the nonapplication of sec. 170(e)(1)(A) to the donation of the Makai stock because a sale of that stock would have produced $600,000 of long-term capital gain. We noted that the transaction was motivated by the partnership's need for a large deduction to offset $193,500 of debt forgiveness income arising out of the bargain settlement of a $200,000 debt secured by a mortgage on the Aegir. See Ford v. Commissioner, T.C. Memo. 1983-556, 1983 Tax Ct. Memo LEXIS 227, at \*7.

[*17] aspects of a particular transaction depend upon its substance and not the form in which it is embodied." See id. at *12-*13 (citing, among other cases, Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945), and Higgins v. Smith, 308 U.S. 473, 476 (1940)).

Respondent states that, at trial, he "will present evidence that RERI's acquisition and donation of the successor member interest lacked economic substance because the transaction did not have a non-tax business purpose"; also that "the members invested in RERI to obtain an inflated charitable contribution deduction, which had no effect on their economic positions, other than to reduce taxes in the year of donation."

III. Analysis

In Skripak and in the other, similar cases following Skripak upon which petitioner relies, e.g., Weitz v. Commissioner, T.C. Memo. 1989-99; Hunter v. Commissioner, T.C. Memo. 1986-308, we were faced with taxpayers who participated in tax avoidance programs that, in a nutshell, involved buying tangible personal property at distress prices for the sole purpose of contributing the property to a qualified charitable recipient. In those cases, we held that the taxpayer's lack of any nontax purpose in entering into the transactions (i.e., the transactions' lack of "economic substance") was not a deterrent to the taxpayer's

[*18] entitlement to a charitable contribution deduction. The taxpayer's deduction, however, was limited to the fair market value of the contributed property, which, in Skripak, we determined to be less than the distress price the taxpayer paid for the property. Ford, on the other hand, did not involve a taxpayer's direct purchase and subsequent contribution of property. In Ford, the issue was whether the formation of a corporate shell should be respected for Federal tax purposes where the sole purpose of the corporation was to enable the taxpayers (and others similarly situated) to obtain a charitable contribution deduction that would otherwise have been unavailable to them. We held that, because the corporation was formed solely for tax avoidance purposes and was without economic substance, its separate existence must be disregarded for tax purposes. We recast the transaction (a contribution of the corporation's stock) as the partnership-shareholder's direct contribution to UH of the property that it had previously contributed to the corporation. As recast, the transaction gave rise to no charitable contribution deduction.

Skripak and its progeny are distinguishable from Ford, which embodies the longstanding and, therefore, unremarkable judicial principle that an entity organized and used for the sole purpose of participating in a tax avoidance transaction (e.g., to metamorphose ordinary income property into a capital asset)

**[\*19]** will be disregarded for Federal tax purposes.  See, e.g., Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); Gregory v. Helvering, 293 U.S. 465, 469-470 (1935).

Because, in Ford, we did no more than apply well-established legal principles to the facts before us, it was appropriately issued as a Memorandum Opinion rather than as a published Tax Court Opinion.  The only unusual feature of Ford was its application of the economic substance or business purpose doctrine to disregard an entity in the context of a purported charitable contribution.  But although it may have been unusual, it was not a unique application of that doctrine.  In Torney v. Commissioner, T.C. Memo. 1993-385, 1993 WL 325063, the principal issue was whether shares of stock that the taxpayers contributed to a charitable organization constituted a long-term capital asset (i.e., property held by the taxpayers for more than six months before the contribution).  We held that the shares had not been held for more than six months and, also, that the contributed shares had no value on the contribution date.  Additionally, we denied the charitable contribution deduction on the ground that "the transaction lacked economic substance".  Torney v. Commissioner, 1993 WL 325063, at \*8.  The transaction consisted of the issuance to the taxpayers of shares in a corporation controlled by an individual (Yeaman) who, through a close friend of the

[*20] taxpayers', suggested to them that they donate the shares to a charitable organization supported by Yeaman. The taxpayers made the suggested charitable contribution. We determined that "[t]he substance of the case before us is transfers of stock between related entities with * * * [the taxpayers] acting as a conduit." We noted that the taxpayers "never exercised any control over the stock" and that the charitable organization "never benefited from ownership of the stock". We then held that the taxpayers' "donation of the stock lacked economic substance and, therefore, was not a charitable contribution within the meaning of section 170(a)." Id. at *7-*8. Simply on the basis of our decisions in Ford and Torney, we must deny petitioner's motion for a judgment that the doctrines of sham and lack of economic substance "are not" (i.e., can never be) applicable or relevant to the determination of whether a taxpayer's contribution to a charitable organization is deductible under section 170.

It is possible, however, to construe petitioner's motion more narrowly; viz, petitioner is merely seeking a determination that, in the context of a charitable contribution akin to the contributions considered in Skripak, the doctrines of sham and lack of economic substance do not bear upon the deductibility of a contribution under section 170. Petitioner does, indeed, argue that Skripak "is * * * a case very similar to this one" and that our holding in Ford must be strictly

[*21] limited to its facts, i.e., an attempt to organize a corporation for the sole purpose of avoiding the section 170(e)(1)(A) limitation on contributions of ordinary income property. While there is a surface similarity between the facts in Skripak and the facts of this case (i.e., in both cases, the person making the contribution purchased the contributed property solely for that purpose), that similarity masks what may be a crucial difference between the two transactions. In Skripak the persons (individuals) purchasing and contributing books to rural libraries were the ones who realized the resulting tax benefit. Here, the person (RERI) who purchased and contributed the SMI to the University is not the taxpayer claiming a charitable contribution deduction on account of the gift. See sec. 703(a)(2)(C). Those taxpayers are RERI's members. See sec. 702(a)(4).

Respondent is clear that he believes: "RERI was a sham partnership formed for the sole purpose of acquiring the successor member interest and donating it to a charity, and its members did not join together in good faith and act with a business purpose in the present conduct of a business enterprise." He is also clear that he intends at trial to "present evidence that RERI's acquisition and donation of the successor member interest lacked economic substance because the transaction did not have a nontax business purpose". And finally, he clearly states his conclusion "that the 'economic substance', 'sham', and 'substance over form'

[*22] doctrines may be applied to disallow a charitable contribution deduction when the tax benefits claimed by a sham entity run counter to the legislative goals underlying section 170." Respondent is not clear, however, in tying together those three statements. Does he merely wish to prove that RERI is to be disregarded as a business entity since it was not formed to jointly carry on a business venture? See sec. 301.7701-1(a)(2), Proced. & Admin. Regs. If so, so what? Disregarding RERI arguably results in a transaction which is, in substance, a direct purchase and contribution of the SMI by RERI's members, a scenario that, presumably, would be controlled by Skripak. After all, RERI's members did, in fact, put up the funds that were actually used to purchase the SMI (from RJS) that was thereafter contributed to the University. Also, if we were to find that the transaction by which RERI acquired and then donated the successor member interest to the University had no nontax business purpose, again: So what? Have we not said sufficiently that gifts to charity need have no economic substance beyond the mere fact of the gift? See, e.g., Skripak v. Commissioner, 84 T.C. 285; Weitz v. Commissioner, T.C. Memo. 1989-99; Hunter v. Commissioner, T.C. Memo. 1986-308. And what tax benefits from its charitable contributions does a passthrough entity, even a sham passthrough entity, enjoy that might run afoul of the purpose of section 170? Beyond generalities, respondent has not enlightened us as to how

[*23] his allegations as to sham and lack of economic substance affect RERI's members' entitlements to charitable contribution deductions on account of RERI's contribution of the SMI to the University. Nor, apparently, has petitioner used the tools of discovery to force respondent's hand. Without a better understanding of the role RERI plays in each party's calculus, we think that it would be imprudent for us to speculate that this case is more Skripak-like than Ford-like and to grant the motion on that basis.

IV.   Conclusion

Whether RERI was organized solely for tax avoidance purposes and lacked economic substance may be a relevant issue in determining whether its contribution of the SMI to the University entitled its members to charitable contribution deductions on account thereof. It remains to be seen whether that is the case. Therefore, as stated, we will deny the motion.

An appropriate order will be issued denying petitioner's motion for partial summary judgment.